Melissa A. Fortunato (SBN 319767)
   fortunato@bespc.com
Marion C. Passmore (SBN 228474)
   passmore@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
445 S. Figueroa Street, Suite 3100
Los Angeles, CA  90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GWYNETH HUTCHINSON, derivatively on behalf of OLAPLEX HOLDINGS, INC. <br><br> Plaintiff, <br><br> v. <br><br> ADVENT INTERNATIONAL CORPORATION, CHRISTINE DAGOUSSET, DEIRDRE FINDLAY, TRICIA GLYNN, JANET GURWITCH, MARTHA MORFITT, DAVID MUSSAFER, ERIC TIZIANI, TIFFANY WALDEN, EMILY WHITE, MICHAEL WHITE, JUE WONG, And PAULA ZUSI, <br><br> Defendants, <br><br> and <br><br> OLAPLEX HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

NATURE OF THE ACTION ............................................................................ 1

JURISDICTION AND VENUE ........................................................................ 5

PARTIES ........................................................................................................... 6

THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE
COMPANY AND ITS STOCKHOLDERS ...................................................... 10

THE AUDIT COMMITTEE DEFENDANTS OWE ADDITIONAL DUTIES ...... 14

BACKGROUND ............................................................................................... 16

THE INDIVIDUAL DEFENDANTS BREACH THEIR DUTIES TO THE
COMPANY AND ITS STOCKHOLDERS ...................................................... 19

    A.   The Offering Documents Failed to Disclose  and Misrepresented
        Significant Risks from  Laws and Regulations' Impacting Olaplex's
        Business ................................................................................................. 19

    B.   The Offering Documents Contained Misstatements  and Omissions
        Regarding the Strength of the Company's Brand Reputation and Social
        Media Community Engagement ....................................................... 31

    C.   The Offering Documents Contained Misstatements and Omissions
        Regarding the Company's Competition and Related Risks ............................ 40

    D.   The Offering Documents Contained Misstatements and  Omissions About
        the "Clean" Nature of Olaplex's Products ....................................... 49

    E.   Events After the IPO Demonstrate that the Offering Documents Were
        Materially False and Misleading at the Time of the Offering ........................ 52

THE TRUTH BEGINS TO EMERGE ............................................................. 56

THE TRUTH IS REVEALED .......................................................................... 75

THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT
ARTIFICIALLY INFLATED PRICES ............................................................. 78

CONFIDENTIAL WITNESSES IN THE SECURITIES CLASS ACTION
CORROBORATE THE WRONGDOING ALLEGED HEREIN ........................... 79

THE INDIVIDUAL DEFENDANTS' MISCONDUCT DIRECTLY AND
PROXIMATELY CAUSES DAMAGES TO OLAPLEX ........................................ 83

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...... 83

PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS .......................... 84

DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY .......................... 85

THE AUDIT COMMITTEE DEFENDANTS FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY .......................... 87

THE INSIDER TRADING DEFENDANTS ON THE BOARD FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY .......................... 87

THE SECURITIES CLASS ACTION DEFENDANTS ON THE BOARD FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY .......................... 88

DEFENDANTS DAGOUSSET, FINDLAY, GLYNN, GURWITCH, MORFITT, MUSSAFER, E. WHITE, M. WHITE, AND ZUSI LACK INDEPENDENCE ...... 88

FIRST CAUSE OF ACTION Against the Individual Defendants for Breach of Fiduciary Duties .......................... 89

SECOND CAUSE OF ACTION Against the Securities Class Action Defendants for Contribution under Sections 14(a) of the Exchange Act .......................... 93

THIRD CAUSE OF ACTION Against the Securities Class Action Defendants for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act .......................... 94

FOURTH CAUSE OF ACTION Against the Individual Defendants for Unjust Enrichment .......................... 95

FIFTH CAUSE OF ACTION Against the Individual Defendants for Waste of Corporate Assets .......................... 96

SIXTH CAUSE OF ACTION Against the Individual Defendants for Aiding and Abetting .......................... 96

SEVENTH CAUSE OF ACTION Against the Insider Trading Defendants for Insider Selling and Misappropriation of Information .......................... 98

EIGHTH CAUSE OF ACTION Against the Insider Trading Defendants for Indemnification .......................... 99

PRAYER FOR RELIEF .......................... 99

JURY TRIAL DEMANDED .......................... 100

VERIFICATION .......................... **Error! Bookmark not defined.**

## INTRODUCTION

Plaintiff Gwyneth Hutchinson ("Plaintiff"), by and through her counsel, derivatively on behalf of Nominal Defendant Olaplex Holdings, Inc. ("Olaplex" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants (as defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Olaplex with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Olaplex; (iii) a securities class action against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between September 27, 2021 and November 17, 2022 (the "Relevant Period") with respect to Olaplex's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Olaplex.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserted by Plaintiff on behalf of Nominal Defendant Olaplex against certain officers and the members of the Company's Board for the claims asserted herein to recover damages caused to the Company.

2.      Olaplex manufactures and sells high-end beauty products, particularly haircare products. As the name implies, participating in the high-end haircare market requires high-quality products to be successful and to gain and maintain a solid reputation among hairstylists and the other end users of such products. Olaplex

purported to be just that—a high-end manufacturer of high-quality products—and it enjoyed considerable success.

3.      Seeking to further bolster its success as a manufacturer of luxury beauty products, Olaplex went public on or about September 29, 2021, issuing 73,700,000 shares of its common stock in an initial public offering (or "IPO") at an offering price of $21.00 per share for approximate proceeds of $1,466,445,750 to the Company (after applicable underwriting discounts and commissions).

4.      Unbeknownst to the Company's investors and consumers, one of Olaplex's key products—dubbed No. 3 Hair Protector—used a chemical that the Scientific Committee for Consumer Safety of the European Commission (the "SCCS") had determined could not "be considered safe" in May 2019.

5.      That chemical is called Butylphenyl methylpropional (p-BMHCA) or "lilial," and in August 2020, the European Union ("E.U.") banned its use in cosmetics effective March 1, 2022, because of its link to infertility.

6.      Using such a product fundamentally contradicted Olaplex's marketing of its brand as safe and clean; however, the Company continued to use lilial in its No. 3 Hair Protector while touting the purity of Olaplex products.

7.      The Company knew that Olaplex would lose its competitive advantage and popularity and that the Company's IPO would not have been able to proceed as scheduled if consumers and investors became aware of the lilial issue. Thus, in June 2021, the Company quietly removed lilial from No. 3 Hair Protector. It would be banned by the E.U. less than nine months later.

8.      On or about September 29, 2021, the Company conducted its IPO, only a few months after removing lilial from its No. 3 Hair Perfector product.

9.      For the IPO, Olaplex filed a registration statement on Form S-1 with the SEC on August 27, 2021, which the SEC declared effective on September 29, 2021 (the "Registration Statement").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.   The Company then filed a prospectus on Form 424B4 with the SEC in connection with the IPO on October 1, 2021, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

11.   The Offering Documents failed to disclose, among other things, that Olaplex's No. 3 Hair Perfector product contained the reprotoxic ingredient, lilial, prior to and after the IPO, and that the E.U. had banned the use of lilial on August 2020, with an effective date of March 1, 2022. The Offering Documents also failed to disclose that the Company reformulated its No. 3 Hair Perfector product behind closed doors in an attempt to hide from consumers and investors that the Company was not producing "clean" products, which would and did, negatively impact Olaplex's competitive advantage against competitors and consumer popularity. Thus, the Offering documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face.

12.   During the period of wrongdoing described herein, Olaplex insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information. Specifically, during the Relevant Period, Defendants David Mussafer ("Mussafer"), Martha Morfitt ("Morfitt"), Michael White ("M. White"), and Defendant Advent International Corporation ("Advent") sold a total of 79,017,684 shares of Company stock for proceeds of over $1.57 billion while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information.

13.   On February 27, 2022, Hasini Kay ("Kay"), a hair and skin influencer on the social media platform TikTok posted two videos expressing her disappointment that Olaplex products may be banned in the E.U. and in the U.K because of safety

concerns related to the Company's use of lilial in its No. 3 Hair Perfector product, which may cause reproductive harm in humans.

14.     The videos revealed for the first time to consumers and investors that an Olaplex product had contained lilial. The video went viral and damaged the Company's brand, its reputation, its competitive position, and ultimately, its sales revenue.

15.     On September 29, 2022, a Piper Sandler analyst downgraded Olaplex to Neutral from Overweight, stating that her work revealed that "competition and misinformation pose growing risks to the company." In addition, the analyst indicated that she anticipated investments in marketing and education were needed to offset the headwinds and that there was "little room for valuation upside given the risks at play."

16.     In response to these disclosures, the Company's stock price declined 12.15%, or $1.33 per share, to close on September 29, 2022, at $9.62 per share.

17.     Then, on October 18, 2022, Olaplex issued a press release in which the Company revised its guidance for the 2022 fiscal year, stating that it now expected fiscal year 2022 revenue between $704 million and $711 million, significantly down from its prior guidance range of $796 million to $826M.

18.     Olaplex admitted that "[t]he Company's updated guidance primarily reflects a slowdown in sales momentum that it attributes to macro-economic pressures, increased competitive activity including discounting, and a moderation in new customer acquisition, as well as inventory rebalancing across certain customers which the Company believes are in response to these same macro-economic pressures."

19.     In response to this news, Olaplex's stock price dropped 56.69%, or $5.55 per share, to close on October 19, 2022 at $4.24 per share.

20.     On February 28, 2023, Olaplex reported its financial results for the fourth quarter and full-year 2022. The results included a disappointing decrease in net sales

4
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by 21.5% for the fourth quarter and only a 17.7% increase in net sales for fiscal year 2022, as compared to net sales growth of 112% for fiscal year 2021. The Company also admitted that it needed to restabilize the business and invest a substantial amount of money into rehabilitating Olaplex's brand reputation.

21.   On November 17, 2022, a purported purchaser of Company stock filed a securities class action complaint, captioned *Lilien v. Olaplex Holdings, Inc. et al*., Case No. 2:22-cv-08395 in the United States District Court for the Central District of California against Olaplex and the Securities Class Action Defendants (defined below) (the "Securities Class Action"). The *Lilien* Complaint alleges that throughout the class period of September 27, 2021 to November 17, 2022, the defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.

22.   The Individual Defendants (as defined herein) breached their fiduciary duties of loyalty and good faith and committed other violations of law by willfully engaging in the wrongdoing as alleged herein. As a direct and proximate result of the Individual Defendants'' breaches of fiduciary duty, Olaplex has sustained damages as described herein.

## JURISDICTION AND VENUE

23.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims asserted herein raise a federal question under Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 promulgated thereunder as well as Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24.     This Court has jurisdiction over each Individual Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Olaplex. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Olaplex could have sued the same Defendants in this District.

## PARTIES

26.     Plaintiff is a stockholder of Olaplex. She was a stockholder at the time of the wrongdoing alleged herein and has continuously held stock in the Company from that time until the present.

27.     Nominal Defendant Olaplex is incorporated under the laws of Delaware, and its principal executive offices are located at 1187 Coast Village Road, Suite 1-520, Santa Barbara, California 93108. Olaplex's common stock trades on the Nasdaq exchange under the symbol "OLPX."

28.     Defendant Advent is a large private equity firm with principal executive offices in Boston, Massachusetts. As of April 28, 2023, Advent beneficially owned 499,468,711 shares of the Company's common stock, constituting 76.3% of the total outstanding common stock of the Company. Advent is affiliated with Advent Funds, which acquired the Olaplex business in January 2020.

29.     Defendant Christine Dagousset ("Dagousset") has been a member of the Board since August 2021 and serves as a member of the Nominating and Corporate

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Governance Committee ("Governance Committee"). Defendant Dagousset reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

30.     Defendant Deirdre Findlay ("Findlay") has been a member of the Board since August 2021 and serves as Chair of the Governance Committee. Defendant Findlay reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

31.     Defendant Tricia Glynn ("Glynn") has been a member of the Board since August 2021 and serves as Chair of the Compensation Committee and as a member of the Governance Committee. Defendant Glynn has worked at Advent since 2016, where she currently serves as a managing partner, focusing on buyouts and growth equity investments in the retail, consumer, and leisure sectors. Defendant Glynn previously served as a managing director at Advent from 2016 to 2022. Defendant Glynn reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

32.     Defendant Janet Gurwitch ("Gurwitch") has been a member of the Board since August 2021 and serves as a member of the Audit Committee. Prior to the pre-IPO reorganization, Ms. Gurwitch had been a member of the Board of Managers of Penelope Group GP (the "Board of Managers of Penelope"). Defendant Gurwitch has worked with Advent since April 2020 as an advisor focusing on the beauty and wellness sector. Defendant Gurwitch reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

33.     Defendant Morfitt has been a member of the Board since August 2021 and serves as Chair of the Audit Committee. Prior to the pre-IPO reorganization, Defendant Morfitt had been a member of the Board of Managers of Penelope since April 2021. Defendant Morfitt reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

34.     Defendant Mussafer has been a member of the Board since August 2021 and serves as a member of the Compensation Committee. Prior to the pre-IPO reorganization, Defendant Mussafer had been a member of the Board of Managers of Penelope since January 2020. Defendant Mussafer has been a Chairman and Managing Partner of Advent since 1990. Defendant Mussafer reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

35.     Defendant Eric Tiziani ("Tiziani") is the Company's Chief Financial Officer ("CFO"). Defendant Tiziani joined Olaplex in June 2021 and has served as CFO since August 2021. Defendant Tiziani reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

36.     Defendant Tiffany Walden ("Walden") was the Chief Operating Officer ("COO") of Olaplex at all relevant times, including at the time of the IPO. Defendant Walden joined Olaplex in approximately 2016. Defendant Walden reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC. In the wake of significant negative publicity about Olaplex's products and disappointing financial performance, Olaplex announced Defendant Walden's sudden resignation on October 18, 2022, effective immediately.

37.     Defendant Emily White ("E. White") has been a member of the Board since August 2021 and serves as a member of the Governance Committee. Prior to the pre-IPO reorganization, Defendant E. White had been a member of the Board of Managers of Penelope since January 2020. Defendant E. White reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

38.     Defendant M. White has been a member of the Board since August 2021. Prior to the pre-IPO reorganization, Defendant M. White had been a member of the Board of Managers of Penelope since January 2020. Defendant M. White is a principal

at Advent and has focused on buyouts and growth equity investments in the retail, consumer, and leisure sector since joining Advent in 2019. Defendant M. White reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

39.     Defendant JuE Wong ("Wong") was the Chief Executive Officer ("CEO") of Olaplex at all relevant times until her departure in July 2023. She became the CEO in January 2020 and was elevated to President, CEO, and director in August 2021. Defendant Wong reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

40.     Defendant Paula Zusi ("Zusi") has been a member of the Board since August 2021 and serves as a member of the Audit Committee. Prior to the pre-IPO reorganization, Defendant Zusi had been a member of the Board of Managers of Penelope since July 2020. In 2015, Defendant Zusi founded Global Retail Advisors, LLC, which provides consulting on supply chain and operational capabilities to Advent. Defendant Zusi reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

41.     Relevant Non-Party Amanda Baldwin ("Baldwin") has served as CEO and a member of the Board since December 2023.

42.     Relevant Non-Party John P. Bilbrey ("Bilbrey") served as interim CEO from July 2023 to December 2023 and as Executive Chair of the Board since July 2023.

43.     The following Defendants are collectively referenced herein as the "Individual Defendants": Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Tiziani, Walden, E. White, M. White, Wong, and Zusi.

44.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, E. White, M. White, and Zusi.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

45.     The following Individual Defendants are collectively referenced herein as the "Officer Defendants": Tiziani, Walden, and Wong.

46.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Gurwitch, Morfitt, and Zusi.

47.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Advent, Glynn, Mussafer, and M. White.

48.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Tiziani, Walden, E. White, M. White, Wong, and Zusi.

49.     The Individual Defendants, Advent, and Nominal Defendant Olaplex are collectively referenced herein as "Defendants."

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

50.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Olaplex.

51.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

52.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their own personal interest or benefit.

53.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and

candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

54.    Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

55.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Olaplex were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

56. The Individual Defendants knowingly violated their obligations as directors and/or officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

57. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Olaplex.

58. The Board has adopted Olaplex's Code of Conduct and Ethics ("Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Director Defendants and Officer Defendants.

59. The Code of Conduct provides that the Director Defendants and Officer Defendants "are required to deal fairly with Olaplex customers, suppliers, and competitors at all times." It further provides that "[w]hile directors, officers and employees are expected to work to advance the interests of Olaplex, they are expected to do so in a manner that is consistent with the highest standard of integrity and ethical dealing."

60. The Code of Conduct also provides that "[n]o director, officer, employee or Business Associate is to take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of facts or any other practice that is or may be considered unfair."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

61.     Regarding the Company's advertising and promotion, the Code of Conduct states:

> The U.S. Food and Drug Administration ("FDA"), Federal Trade Commission ("FTC"), and various other local, state, and foreign governmental authorities regulate the claims that Olaplex, its directors, officers, employees and Business Associates can make about our products on labels or in advertisements, promotions, endorsements or other communications. Generally, these laws prohibit the false, misleading or deceptive advertising and related activities in connection with the sale of our products.

> All advertising claims about our products (including those made in print, radio, TV, on the internet, or which appear on product packaging) must be truthful and have a reasonable basis in fact. In particular, the FTC requires that all advertising claims be substantiated prior to publication or dissemination. Additionally, endorsements of our products must disclose any material connection between the endorser and our Company, reflect the honest opinion of the endorser based on bona fide use of the product, and cannot be used to make a claim about a product that Olaplex could not itself legally make.

> Fair and accurate advertising is essential not only to comply with applicable laws, but also to preserve our goodwill and reputation. All advertising and product claims, whether made to the industry or to the public and whether made through the media, over the internet, or on product packaging, displays, or otherwise, must be reviewed and approved by the Legal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Department. Except for Olaplex-approved statements and activities, directors, officers, employees and Business Associates must not make specific performance claims about Olaplex products or make any claims with regard to the performance or quality of products sold by our competitors.

We expect our directors, officers, employees and Business Associates will abide by FDA, FTC and other legal and regulatory guidance. For any questions or concerns regarding advertisements, promotions, endorsements or other communications, we encourage you to reach out to the CCO.

## THE AUDIT COMMITTEE DEFENDANTS OWE ADDITIONAL DUTIES

62. The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Gurwitch, Morfitt, and Zusi during the Relevant Period.

63. Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the "Company's compliance with legal and regulatory requirements" and "the Company's policies, procedures and practices with respect to risk management and mitigation."

64. Under the heading Controls and Procedures, the Audit Charter states:

Controls and Procedures.

1. Internal Controls and Internal Controls Report. The Audit Committee shall review and discuss with management, the Company's senior internal auditing executive and the independent auditor the adequacy of the Company's internal controls, any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies and, to

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the extent applicable, the Company's internal controls report and the independent auditor's internal controls report prior to the filing of any Annual Report on Form 10-K or any Quarterly Report on Form 10-Q required to be filed by the Company with the SEC.

2.   Disclosure. The Audit Committee shall review disclosures about any significant deficiencies or material weaknesses in the design or operation of internal controls and any fraud involving management or employees playing a significant role in the Company's internal controls made to the Audit Committee by the Company's chief executive officer and chief financial officer, including, to the extent applicable, any disclosures made during their certification process for any Annual Report on Form 10-K or any Quarterly Reports on Form 10-Q required to be filed by the Company with the SEC.

*          *          *

4.   Ethics and Compliance. The Audit Committee shall oversee the Company's ethics and compliance functions, including the Company's Code of Conduct and Ethics and other procedures established by the Company with regard to ethical behavior, avoidance of conflicts of interest and other related matters.

5.   Legal and Regulatory Matters. The Audit Committee shall oversee the Company's compliance with legal and regulatory requirements and confer with the Company's General Counsel about legal matters that may have a material impact on the financial statements or the Company's compliance policies.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

65.     The Audit Charter also provides that the Audit Committee "shall oversee the Company's policies, procedures and practices with respect to risk assessment and management" and "discuss with management the Company's material risk exposures and the steps management has taken to monitor, assess, control and report such risks, including financial risks and risks related to information security, cyber security and data protection."

## BACKGROUND

66.     Olaplex is a high-end haircare product manufacturer. The Company has based its success and reputation on manufacturing "clean" products with the mission to "inform and keep [consumers'] health front and center." The Company describes itself as being "proud to be non-toxic, cruelty-free, and free of all beauty industry toxins." The Company built its brand image on brand trust, influencer marketing, and online reputation.

67.     The Company derives its revenue from three channels: (i) Professional, meaning products sold only through professional hairstylists; (ii) direct-to-consumer ("DTC"); and (iii) Specialty Retail, meaning the sale of its products to major cosmetic retail chains, including Sephora and Ulta Beauty. Of Olaplex's eleven products, three (No. 1 Bond Multiplier, No. 2 Bond Perfector, and No. 4-1 Moisture Mask) are exclusive to Olaplex's Professional channel, which the Company started selling in 2014. The Company expanded into Specialty Retail and DTC in 2018.

68.     By region, the U.S. is Olaplex's largest market, accounting for approximately 56% of the Company's sales in 2022. Nonetheless, Olaplex's international presence, which accounts for the remaining 44% of the Company's sales, spans over 100 countries and is concentrated in Western Europe and the United Kingdom ("U.K."). Thus, Olaplex is subject to numerous international laws and regulations governing the cosmetics industry, including those of the E.U. and the U.K.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

69.    Of Olaplex's eleven products, this action relates to the Company's most important product, No. 3 Hair Perfector, a pre-shampoo treatment aimed at repairing and preventing hair damage. As noted above, Olaplex's No. 3 Hair Perfector formula contained the chemical butylphenyl methylpropional, known as lilial, a fragrance ingredient used in cosmetics.

70.    The Food and Drug Administration ("FDA") is the primary U.S. regulator that oversees the manufacturing and labeling of Olaplex's haircare products. However, despite the existence of FDA regulations, cosmetics manufacturers in the U.S. are still left fundamentally unsupervised when bringing products to market and are not required to seek FDA approval prior to developing and marketing cosmetic products.

71.    However, the E.U. has taken a more rigorous approach to regulating cosmetic products and has banned over 2,500 ingredients from cosmetics, while the U.S. has only banned about eleven.

72.    The E.U.'s Classification, Labelling, and Packaging ("CLP") Regulation grants authority to the E.U. and requires manufacturers to classify, label, and package hazardous chemicals appropriately before placing products containing the hazardous chemicals on the market. The E.U. bases its regulatory actions on research and investigation by the SCCS.

73.    On May 10, 2019, the SCCS issued a final opinion on its investigation into the safety of lilial and determined that it posed a risk of "reproductive toxicity" to humans. The SCCS concluded in its report that "aggregate exposure" of lilial to consumers "cannot be considered as safe." The final opinion also found that lilial was a proven skin allergen to humans and could cause skin irritation upon contact, concluding that "the SCCS considers [lilial] as an 'established contact allergen in humans,' an opinion it has held since 2012 (SCCS, 2012)." Allergic reactions in

response to such allergens in hair products can cause scalp irritation or inflammation, and, if the irritation persists, it can damage hair follicles and cause hair loss.

74.     In August 2020, after the SCCS concluded that lilial was unsafe because of its links to infertility risks, the E.U. exercised its power under the CLP to amend the regulation and ban lilial from consumer products because of these safety concerns. The amendment grouped lilial as a "reprotoxic" substance because it can be harmful to fertility and fetal development. As a result, the E.U. banned the use of lilial in products sold and marketed in the E.U., effective March 1, 2022.

75.     The U.K. also banned lilial and set an October 15, 2022 deadline for U.K. companies to stop distributing products that contained lilial into the market and a December 15, 2022 deadline for removing from the shelves all products containing lilial in the U.K.

76.     As of April 15, 2021, Olaplex was still manufacturing and selling its No. 3 Hair Perfector product containing lilial as shown by its label. It was not until around August 13, 2021 that the Company removed lilial as an ingredient from the label.

77.     The Company's Safety Data Sheet for its No. 3 product, which was updated on June 27, 2021 and is currently posted on its website, omits lilial as an ingredient in the sheet's "complete ingredient list."

78.     The Company went public on or about September 29, 2021, selling 73,700,000 shares of Olaplex common stock at a price of $21 per share for proceeds of almost $1.5 billion net.

79.     Thus, before the IPO, the Company removed lilial as an ingredient, but the Offering Documents failed to disclose that the Company had removed lilial from its No. 3 product and made no mention of the prior use of lilial in an Olaplex product, the impending ban of lilial in the E.U., or the resulting likely potential adverse impact these issues would have on the Company's sales and financial prospects.

**THE INDIVIDUAL DEFENDANTS BREACH THEIR
DUTIES TO THE COMPANY AND ITS STOCKHOLDERS**

80.     Through a series of communications, the Individual Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.

81.     The Offering Documents failed to disclose (i) that the Company's key product No. 3 Hair Perfector, had contained an ingredient—lilial—that was banned by the E.U because it was categorized as unsafe due to infertility risks and that the ban would take effect shortly after Olaplex's IPO; (ii) that in June 2021, the Company quietly reformulated its No. 3 Hair Perfector product to remove lilial from its formula; and (iii) that the use and removal of lilial from its No. 3 Hair Perfector posed significant risks to the Company's brand reputation and competitive positioning, which was crucial to the Company's financial success.

82.     Instead, the Offering Documents disclosed certain risks as being *potential* risks, despite the fact that the risks had already materialized. The Individual Defendants continuously and repeatedly touted the Company's unique brand reputation, social media presence, customer loyalty, and competitive position as crucial drivers of the Company's financial success without disclosing the lilial issue, which exposed all of these, and thus, represented a known, substantial risk or uncertainty to the Company's business that was not accurately disclosed. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

**A.     The Offering Documents Failed to Disclose
and Misrepresented Significant Risks from
Laws and Regulations' Impacting Olaplex's Business**

83.     The Offering Documents emphasized how the Company had built its consumer base on "providing science-driven solutions" and noted the importance of

the Company's social media presence. Specifically, the Offering Documents stated:

> Our dedication to providing science-driven solutions has created an engaged consumer base that we believe advocates authentically for the quality of our products. Our unique relationship with stylists and active involvement with them through digital forums, OLAPLEX Pro App and as brand ambassadors has driven community engagement that has fostered loyalty among the consumer community as well. We continue to build loyal relationships with elite hairstylists and brand ambassadors who educate our consumers, test our products, participate in our brand campaigns and introduce our products to their clientele. Our brand ambassadors also have leadership influence and reach throughout the hairstylist community which reinforces our brand positioning.

*  *  *

> ***Furthermore, our consumers have continued to engage with the OLAPLEX brand online. As of August 31, 2021, the OLAPLEX hashtag has been used over 12.3 million times across social media platforms by our community of professional hairstylists and consumers*** who create their own content about their haircare regimen. In the past year, we had exceptional engagement with our Instagram community of over 2 million followers as of July 31, 2021, which generated over 2.4 million likes and an average of approximately 13,000 story views a day. ***Our passionate consumer base is also demonstrated by our presence on TikTok where our videos have been viewed over 1.5 million times*** between April and September 2021, and,

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as of September 2021, videos using the OLAPLEX hashtag have been viewed over 350 million times since the hashtag first appeared on the platform.

84. The Offering Documents also highlighted how Olaplex's "exceptional social media engagement" contributed to its "strong track-record of successful product launches."

85. The Offering Documents listed "Grow Brand Awareness" as one of Olaplex's "Growth Strategies." Among other things, the Company based its growth strategy on the use of "brand ambassadors" to increase the Company's social media "followership and engagement" and, thus, increase brand awareness. Specifically, the Offering Documents stated:

> As of July 31, 2021**, our powerful digital community** include[d] more than 100 brand advocates, including licensed cosmetologists supporting our content creation, two professional-dedicated communities on social media consisting of over 230,000 hairstylists **and several company-operated accounts including on Instagram, TikTok, Facebook and other social media platforms, where we have demonstrated robust followership and engagement**. . . . We plan to continue to grow our social media engagement by increasing our digital marketing spend and expanding our capabilities to interact with our consumers through OLAPLEX.com and other digital channels.

86. The Offering Documents stated as *potential* risks those associated with the impact of the laws and regulations Olaplex was subject to on the Company's business, prospects, operations, financial condition, and/or cash flows despite the fact that these risks had already materialized. In relevant part, the Offering Documents stated:

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Our products are subject to federal, state and international
2    laws, regulations and policies that could have an adverse effect
3    on our business, prospects, results of operations, financial
4    condition and/or cash flows.

5    **Our business is subject to numerous laws, regulations**
6    **and policies around the world.** Many of these laws and
7    regulations have a high level of subjectivity, are subject to
8    interpretation, and vary significantly from market to market.
9    **These laws and regulations can have several impacts on our**
10   **business, including:**

11   •   delays in **or prohibitions of selling a product or**
12   **ingredient in one or more markets;**

13   •   limitations on our ability to import products into a
14   market;

15   •   delays and expenses associated with compliance,
16   such as record keeping, documentation of the
17   properties of certain products, labeling, and
18   scientific substantiation;

19   •   limitations on the labeling and marketing claims we
20   can make regarding our products; and

21   •   **limitations on the substances that can be included**
22   **in our product, resulting in product**
23   **reformulations**, or the recall and discontinuation of
24   certain products that cannot be reformulated to
25   comply with new regulations.

26   **These events could interrupt the marketing and sale of**
27   **our products, cause us to be subject to product liability claims,**

28

22
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*severely damage our brand reputation and image in the marketplace, increase the cost of our products, cause us to fail to meet customer expectations* or cause us to be unable to deliver products in sufficient quantities or sufficient quality, *which could result in lost sales.*

Before we can market and sell our products in certain jurisdictions, the applicable local governmental authority may require evidence of the safety of our products, which may include testing of individual ingredients at relevant levels. In particular, because Bis-amino is our proprietary ingredient, it typically is not a pre-approved ingredient for use in products in specific jurisdictions and we have been required in the past, and may be required in the future, to perform testing and provide other data and information to governmental authorities prior to the sale of our products in the jurisdiction. For example, Australian authorities have required us to perform additional testing on Bis-amino to register Bis-amino under Australia's Industrial Chemical Introduction Scheme (AICIS), to be able to sell certain of our products in Australia. We are performing the final testing required, and have received provisional approval to sell our products. Although we are confident in our ability to obtain final approval, the Australian authorities could withdraw the provisional approval, resulting in impacts on our sales of certain products in Australia. Furthermore, our international customers are primarily responsible for registering ingredients or otherwise obtaining approvals necessary for them to sell our products in the applicable territory and any failure by them to do so could

decrease sales of our products and harm our reputation. ***Delays in or prohibition of selling our products, or the need to reformulate the ingredients used in our products, could have an adverse effect on our existing business and future growth.***

***Additional laws, regulations and policies, and changes, new interpretation or enforcement thereof, that affect our business could adversely affect our financial results.*** These include accounting standards, laws and regulations relating to tax matters, trade, data privacy and data security, anti-corruption, advertising, marketing, manufacturing, distribution, customs matters, product registration, ingredients, chemicals, packaging, selective distribution, environmental or climate change matters. ***Changes may require us to reformulate or discontinue certain of our products or revise our product packaging or labeling, any of which could result in, among other things, increased costs to us, delays in our product launches, product returns or recalls and lower net sales, and therefore could have an adverse effect on our business, prospects, results of operations, financial condition and/or cash flows.***

87.   Olaplex's risk disclosures were false and/or misleadingly stated as merely possible when, in fact, certain risks had already materialized. The statements made in the paragraph above were false and misleading because the Company only noted in the Offering Documents that Olaplex was subject to "numerous laws, regulations, and policies around the world," that "can have several impacts on [the Company's] business, including delays in or prohibitions of selling a product or ingredient in one or more markets" which "could interrupt the marketing and sale of our products, cause us to be subject to product liability claims, severely damage our

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

brand reputation and image in the marketplace . . . cause us to fail to meet customer expectations or cause us to be unable to deliver products in sufficient . . . quality, which could result in lost sales." In truth, these risks were no longer mere risks; they were serious problems.

88.    The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face because (i) the Company's No. 3 Hair Perfector product had contained lilial; (ii) in May 2019, the SCCS determined that lilial posed a safety risk of reproductive toxicity to humans and was not considered safe, and, thus, Olaplex was aware of the safety risks of its No. 3 Hair Perfector product and could have reformulated the product sooner; (iii) the E.U.'s ban on lilial, which occurred in August 2020, was set to take effect on March 1, 2022; (iv) as a result of the E.U's ban, the Company reformulated—behind closed doors— its No. 3 Hair Perfector product in June 2021 to remove lilial globally, just months before the IPO; (v) despite the E.U.'s ban on lilial and the Company's reformulation of its No. 3 Hair Perfector, Olaplex continued to produce and/or sell its No. 3 Hair Perfector product at the time of and during the months after the IPO; (vi) Olaplex was not selling "clean" products and continued to sell its No. 3 Hair Perfector product containing lilial until at least January 2022; and (vii) consequently, the Company lost sales, customers, market share to competitors, and revenue. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

89.    The Offering Documents also failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face because (i) Olaplex opted to keep its No. 3 Hair Perfector product containing lilial in inventory, which was likely to cause a surplus in inventory and place Olaplex and its distributors at a

high risk position if the Company's sales were to slow down; (ii) Olaplex knew that the E.U.'s ban on lilial would have detrimental effects on Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position; (iii) because the Company was heavily dependent on social media channels to drive sales and marketing and build the overall brand reputation of the Company, Olaplex, could be and, in fact, was damaged by the negative publicity and reputational damage to the Olaplex brand; (iv) the significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand; and (v) consequently, the Company lost sales, customers, market share to competitors, and revenue. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

90.     Furthermore, the Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

91.     The Offering Documents described the risks associated with the safety of its products and the potential for product liability claims as *potential* risks when those risks had already materialized or were significantly likely to do so. Specifically, the Offering Documents stated:

> ***If our products are found to be defective or unsafe we may be subject to various product liability claims, which could harm our reputation and business.***

1    ***Our success depends, in part, on the quality and safety of***
2    ***our products. If our products are found to be defective, unsafe,***
3    ***or otherwise fail to meet our consumers' expectations or if our***
4    ***product claims are found to be unfair or deceptive, our***
5    ***relationships with customers or consumers could suffer, the***
6    ***appeal of one or more of our products could be diminished and***
7    ***we could lose sales, any of which could result in an adverse***
8    ***effect on our business.*** For example, we have historically
9    received complaints regarding our products, including
10   complaints alleging that our products have caused dryness, skin
11   irritation, hair loss, or hair damage, or have failed to improve the
12   look and texture of hair. We conduct testing of our products and,
13   based on these tests, do not believe that our products are the
14   direct cause of such adverse effects. However, regardless of their
15   merit, ***these or future complaints could have a negative impact***
16   ***on the reputation of our products and our brand***, cause us to
17   recall or stop selling our products, or lead to increased scrutiny
18   or enforcement action from regulatory authorities, ***any of which***
19   ***could adversely affect our business and financial results.***

20   92.    The above paragraph was false and misleading because it noted as a
21   potential risk that "[i]f our products are found to be defective, unsafe, or otherwise fail
22   to meet our consumers' expectations or if our product claims are found to be unfair or
23   deceptive, our relationships with customers or consumers could suffer, the appeal of
24   one or more of our products could be diminished and we could lose sales, any of which
25   could result in an adverse effect on our business."

26   93.    The Offering Documents failed to disclose significant, then-existing
27   material events and adverse trends or uncertainties that Olaplex had already been

28
                                    27

facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89.

94.     Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

95.     The Offering Documents inaccurately described as *potential* risks those risks associated with the Company's inability to attract new customers and retain existing customers if Olaplex failed to meet customer expectations or superiority of its products against those of its competitors when, in fact, the risks had already materialized or were significantly likely to do so. Nonetheless, the Individual Defendants caused the Company to continue making false and misleading statements:

> ***If we fail to attract new customers and consumers, retain existing customers and consumers, or fail to maintain or increase sales to those customers and consumers, our business, prospects, results of operations, financial condition, cash flows and growth prospects will be harmed.***
>
> Our success depends in large part upon widespread adoption of our products by consumers. In order to attract new consumers and continue to expand our customer and consumer base, we must appeal to and attract hairstylists and consumers who identify with our products. ***If we fail to deliver a high-quality consumer experience or if our current or potential future customers are not convinced that our products are superior to alternatives, then our ability to retain existing customers, acquire new customers and grow our business <u>may</u>***

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*be harmed*. We have made significant investments in enhancing our brand, attracting new customers and interacting with our hairstylist and consumer communities, and we expect to continue to make significant investments to promote our products. Such campaigns can be expensive and may not result in new customers or consumers or increased sales of our products. Further, as our brand becomes more widely known, we may not attract new consumers or increase our net sales at the same rates as we have in the past. ***If we are unable to acquire new customers who purchase products in numbers sufficient to grow our business, we <u>may</u> not be able to generate the scale necessary to drive beneficial network effects with our suppliers, our net revenues may decrease, and our business, financial condition and operating results <u>may</u> be materially adversely affected.***

In addition, our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net sales are generated from sales to existing customers, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. We may be affected by changes in the policies and demands of our professional and specialty retail customers relating to inventory management, changes in pricing, marketing, advertising and/or promotional strategies by such customers, space reconfigurations by our customers or any significant decrease in our display space or online prominence or the ongoing COVID-19 pandemic as retailers faced store closures or reduced traffic. ***If existing customers no longer find***

*our products appealing,* are not satisfied with our customer service, including shipping times, or if we are unable to timely update our products to meet current trends and customer demands, *our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.*

*If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations and growth prospects will be harmed.*

96.   The above paragraph was false and misleading because the Company described the following merely as a *potential* risk: "If we fail to attract new customers and consumers, retain existing customers and consumers, or fail to maintain or increase sales to those customers and consumers, our business, prospects, results of operations, financial condition, cash flows and growth prospects will be harmed."

97.   The above-referenced paragraph was also false and misleading because the Offering Documents inaccurately described as potential risks certain risks associated with Olaplex's ability to attract new customers and retain existing customers "*if*" the Company failed "to meet customer expectations" or "customers were not convinced that our products are superior" to competitors,' which could have an adverse effect on Olaplex's business, financial condition, and results of operations.

98.   The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

99.    Furthermore, the Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

**B.    The Offering Documents Contained Misstatements and Omissions Regarding the Strength of the Company's Brand Reputation and Social Media Community Engagement**

100.    The Offering Documents also touted Olaplex's purportedly loyal and engaged community of professional hairstylists and consumers as a competitive advantage in the cosmetic industry and a source of growth. The Company attributed its competitive growth to the Company's "Science-Backed Brand that Attracts a Loyal and Engaged Community," which "created a strong and loyal following for OLAPLEX." The Offering Documents stated:

> Science-Backed Brand that Attracts a Loyal and Engaged Community
>
> We offer science-backed solutions that improve hair health and are trusted by stylists and consumers. We identify our consumers' most relevant haircare concerns in collaboration with our passionate and highly engaged community of professional hairstylists and consumers, and strive to address them through our proprietary technology and innovation capabilities. Our deep roots in the professional haircare community and strong ties with our global network of hairstylists creates a continuous feedback loop, providing unique insight into the hair health goals and concerns of our consumers. Our

hairstylists are our strongest advocates; they have grown with our business since our founding in 2014, and through mutual support we have empowered them to connect with their clients and to champion our brand through an engaged and active social community. This community also provides insight into consumer needs and positions OLAPLEX to leverage our research and development platform to respond to consumers' demands for improved hair health by creating high-quality products that result in healthy, beautiful hair. Results have validated our approach. We believe that over 90% of our consumers think OLAPLEX products make their hair healthier, which we believe is among the highest ratings compared to competitors in this category. Moreover, we believe OLAPLEX's professional net promoter score of 71% as of April 2021 is the highest in our brand category and well above the average score in our category. ***The quality of our products, combined with our community-driven approach to engaging with both professional hairstylists and our consumers, have created a strong and loyal following for OLAPLEX that we believe provides a unique competitive advantage and foundation for growth.***

101. The statements in the paragraph above were inaccurate because the Company touted Olaplex's "quality of [its] products, combined with [the Company's] community-driven approach to engaging with both professional hairstylists and [Olaplex's] consumers, have created a strong and loyal following for OLAPLEX that we believe provides a unique competitive advantage and foundation for growth." In truth, the Offering Documents failed to disclose that the quality of Olaplex's No. 3 Hair Perfector product was subpar because it contained the reprotoxic ingredient lilial.

Olaplex knew that if news broke out that its No. 3 Hair Perfector product needed to be reformulated, consumers would no longer think that "OLAPLEX products make their hair healthier," and the Company's "net promoter score" would dwindle and negatively impact the Company's competitive advantage.

102.   The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89.

103.   Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

104.   The Offering Documents also described as *potential* risks, certain risks relating to the Company experiencing "negative publicity" and "the use of social media and internet based-communication" in marketing the Company's products and the impact on Olaplex's brand image and reputation and, thus, negatively impact the Company's business, financial condition, and results of operations. Specifically, the Offering Documents included as *potential* risks the following risks that had already materialized or were significantly likely to do so:

> ***Our business depends on our ability to maintain a strong community of engaged customers, consumers and ambassadors including by social media. We may not be able to maintain and enhance our brand if we experience negative publicity*** related to our marketing efforts or use of social media, fail to maintain and grow our network of ***ambassadors or***

1    ***otherwise fail to meet our customers' or consumers'***
2    ***expectations.***

3         We currently partner with eight brand ambassadors who
4    promote and market our products, participate in product
5    launches, engage with our professional hairstylist and consumer
6    community and educate them about Olaplex products. Our
7    ability to maintain relationships with our existing ambassadors
8    and to identify new ambassadors is critical to expanding and
9    maintaining our customer and consumer base. As our market
10   becomes increasingly competitive or as we expand
11   internationally, recruiting and maintaining new ambassadors
12   may become increasingly difficult. If we are not able to develop
13   and maintain strong relationships with our ambassador network,
14   our ability to promote and maintain awareness of our brand may
15   be adversely affected. Further, if we incur excessive expenses in
16   this effort, our business, financial condition and results of
17   operations may be adversely affected.

18        ***We and our ambassadors often use third-party social***
19   ***media platforms to raise awareness of our brand and engage***
20   ***with our hairstylist and consumer community. In recent years,***
21   ***there has been a marked increase in the use of social media***
22   ***platforms, including blogs, chat platforms, social media***
23   ***websites, and other forms of internet-based communications***
24   ***that allow individuals to interact with our products, which acts***
25   ***as a means to enhance brand awareness. As existing social***
26   ***media platforms evolve and new platforms develop, we and our***
27   ***ambassadors must continue to maintain a presence on these***
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*platforms and establish presences on emerging popular social media platforms.* If we are unable to cost-effectively develop and continuously improve our consumer-facing technologies, such as social media platforms, our ability to acquire new customers and consumers may suffer and we may not be able to provide a convenient and consistent experience to our consumers regardless of the sales channel. This could negatively affect our ability to compete with other companies and result in diminished loyalty to our brand.

*The use of social media by our brand ambassadors, our consumers and us has increased the risk that our image and reputation could be negatively impacted.* In particular, the reputation of our brand ambassadors could impact how consumers view our products or brand. *The rising popularity of social media and other consumer-oriented technologies has increased the speed and accessibility of information dissemination and given users the ability to organize collective actions such as boycotts and other brand-damaging behaviors more effectively. The dissemination of information via social media could harm our brand or our business, regardless of the information's accuracy. This could include negative publicity related to our products or negative publicity related to actions taken (or not taken) by us or our executives*, team members, employees, brand ambassadors, contractors, collaborators, vendors, consultants, advisors or other individuals or entities that may be perceived as being associated with us. Such negative publicity may relate to actions taken (or not taken) with respect

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to social, environmental, and community outreach issues and initiatives. The harm may be immediate, without affording us an opportunity for redress or correction and could have an adverse effect on our business, financial condition and results of operations. In addition, an increase in the use of social media for product promotion and marketing may increase the burden on us to monitor compliance of such materials, and increase the risk that such materials could contain problematic product or marketing claims in violation of applicable regulations. For example, in some cases, the U.S. Federal Trade Commission ("FTC") has sought enforcement action where an endorsement has failed to clearly and conspicuously disclose a financial relationship or material connection between an influencer and an advertiser.

We also do not prescribe what our ambassadors post, and our ambassadors could engage in behavior or use their platforms in a manner that reflects poorly on our brand or is in violation of applicable regulations or platform terms of service, and all these actions may be attributed to us. ***In addition, customer complaints or negative publicity related to our*** website, mobile app, ***products,*** product delivery times, customer data handling, marketing efforts, security practices or customer support, ***especially on blogs and social media websites, could diminish customer loyalty and community engagement. Our inability or failure to recognize, respond to, and effectively manage the accelerated impact of social media could adversely impact our business***.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Further, laws and regulations, including associated enforcement priorities, rapidly evolve to govern social media platforms and other internet-based communications, and any failure by us, our ambassadors or other third parties acting at our direction or on our behalf to abide by applicable laws and regulations in the use of these platforms could subject us to regulatory investigations, class action lawsuits, liability, fines or other penalties. ***Other risks associated with the use of social media and internet-based communication include improper disclosure of proprietary information, negative comments about our brand or products***, exposure of personally identifiable information, fraud, hoaxes, or malicious dissemination of false information. ***Damage to the brand image and our reputation could have an adverse effect on our business, results of operations and financial condition.***

105. The statements in the paragraph above were each inaccurate statements of material fact when made because they only noted the potential negative impacts on Olaplex's business, financial condition, and results of operations.

106. The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104.

107. Furthermore, the Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

108.   The Offering Documents stated as *potential* risks certain risks associated with consumer preferences and the impact of social media on those preferences when, in fact, those risks had already materialized or were significantly likely to do so. Specifically, the Offering Documents stated as follows:

Our inability to anticipate and respond to market trends and ***changes in consumer preferences could adversely affect our financial results.***

***Our continued success depends on our ability to anticipate, gauge and react in a timely and cost-effective manner to changes in consumer tastes for haircare*** and other beauty products, attitudes toward our industry and brand, as well as to where and how consumers shop. ***We must continually work to maintain and enhance the recognition of our brand***, develop, manufacture and market new products, maintain and adapt to existing and emerging distribution channels, successfully manage our inventories and modernize and refine our approach as to how and where we market and sell our products. ***Consumer tastes and preferences cannot be predicted with certainty and can change rapidly. The issue is compounded by the increasing use of digital and social media by consumers and the speed by which information and opinions are shared. If we are unable to anticipate and respond to sudden challenges that we may face in the marketplace, trends in the market for our products and changing consumer demands and sentiment, our business, financial condition and results of operations will suffer.*** In addition, from time to time, sales growth or profitability may be concentrated in a relatively small number of our products or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

countries. ***If such a situation persists or a number of products or countries fail to perform as expected, there could be an adverse effect on our business, financial condition and results of operations.***

109.    The statements in the paragraph above were each inaccurate statements of material fact when made because they only noted the potential negative impacts that "changes in consumer preferences could adversely affect [the Company's] financial results" when, in fact, those risks had manifested or were significantly likely to do so. A negative change in consumer taste and preference is foreseeable and significantly likely to occur after consumers become aware that a product contains a toxic ingredient. In this case, the Individual Defendants were aware that the No. 3 Hair Perfector contained the reprotoxic ingredient, lilial, prior to and after the IPO and, thus, the Individual Defendants were certain that the Company's business, financial condition, and results of operations would suffer as a result of the No. 3 Hair Perfector product containing lilial.

110.    The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104.

111.    Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.     The Offering Documents Contained Misstatements and Omissions Regarding the Company's Competition and Related Risks**

112.   The Offering Documents included numerous risk factors regarding competition that were false and misleading because they warned about potential future risks without adequately disclosing specific, known risks that had already materialized or were significantly likely to do so.

113.   In fact, the Offering Documents repeatedly, misleadingly touted Olaplex's competitive position and advantages as key drivers of the Company's financial success without disclosing the lilial issue, which imperiled all of these, and thus represented a known, substantial risk and uncertainty to the Company's business.

114.   The Offering Documents misleadingly touted the strength of the Company's strong brand reputation, social media presence, and customer loyalty as an advantage for Olaplex's effective competition in the haircare industry as follows:

> Competition in the haircare industry is based on a variety of factors, including innovation, effectiveness of beneficial attributes, accessible pricing, service to the consumer, promotional activities, advertising, special events, new product introductions, e-commerce initiatives and other activities. Our competitors include Henkel AG & Co. KgaA, Kao Corporation, L'Oreal S.A. and Unilever. We also face competition from a number of independent brands. Certain of our competitors also have ownership interests in retailers that are customers of ours.
>
> ***The continued strength of our brand and products is based on our ability to compete with other companies in our industry. We compete primarily by:***
>
> - developing quality products with innovative performance features;

40

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- educating consumers, retail customers and salon professionals about the benefits of our products;
- anticipating and responding to changing consumer, retail customer and salon professional demands in a timely manner, including the timing of new product introductions and line extensions;
- offering products at compelling and accessible price points across channels and geographies;
- ***maintaining favorable brand recognition;***
- developing and sustaining our relationships with our key customers;
- ensuring product availability through effective planning and replenishment collaboration with our customers;
- ***leveraging e-commerce, social media and the influence of our brand ambassadors and developing an effective omni-channel strategy to optimize the opportunity for consumers to interact with and purchase our products both on-line and in brick and mortar outlets;***
- attracting and retaining key personnel;
- maintaining and protecting our intellectual property;
- maintaining an effective manufacturing and distributor network; and
- obtaining and retaining sufficient retail display and floor space, optimal in-store positioning and

effective presentation of our products on retailer's shelves.

***We believe we have a well-recognized and strong reputation in our core markets and that the quality and performance of our products, our emphasis on innovation, and engagement with our professional and consumer community position us to compete effectively.***

115. The statements in the paragraph above were each inaccurate statements of material fact when made because the Company touted its strong brand reputation, social media presence, and customer loyalty and omitted to state other facts necessary to make the statements contained therein not misleading. Although, Olaplex may have been a well-recognized Company with a strong reputation, the Individual Defendants knew at the time the Offering Documents were filed that the quality of its No. 3 Hair Perfector product was below average because it contained lilial and, thus, negatively impacted Olaplex's competitive advantage.

116. The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104, 114.

117. Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

118. The Offering Documents also contained statements touting Olaplex's operation in highly competitive categories and the Company's purported ability to compete in them that were false and misleading because the Company failed to

disclose the lilial issue, which presented a threat to Olaplex's growth drivers and competition. Specifically, the Offering Documents stated:

> ***We operate in highly competitive categories.***
>
> ***We face competition from companies throughout the world, including multinational consumer product companies. Most of our competitors have greater resources than we do, some others are newer companies and some are competing in distribution channels or territories where we are less represented.*** Our competitors also may be able to respond to changing business and economic conditions more quickly than us due to larger research and development operations, manufacturing capabilities and sales force. Competition in the beauty industry is based on a variety of factors, including innovation, effectiveness of beneficial attributes, accessible pricing, service to the consumer, promotional activities, advertising, special events, new product introductions, e-commerce initiatives and other activities. It is difficult for us to predict the timing and scale of our competitors' actions in these areas.
>
> ***Our ability to compete also depends on the continued strength of our brand and products,*** our ability to attract and retain key talent and other personnel, the influence of our brand ambassadors, the efficiency of our third-party manufacturing facilities and distribution network, our relationships with our key customers and our ability to maintain and protect our intellectual property and those other rights used in our business. ***We believe we have a well-recognized and strong reputation in our core***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*markets and that the quality and performance of our products,* our emphasis on innovation, *and engagement with our professional and consumer community position us to compete effectively. However, if our reputation is adversely affected, our ability to attract and retain customers and consumers would be impacted.* In addition, certain of our distributors in the United States and key retailers are owned or otherwise affiliated with companies that market and sell competing brands and, as a result, they may have an interest in promoting theses competing brands over our products. *Our inability to continue to compete effectively in key countries around the world could have an adverse effect on our business, financial condition and results of operations.*

119.   The statements in the paragraph above were each inaccurate statements of material fact when made because, while noting only the potential negative impacts on Olaplex's business, financial condition, and results of operations, the Company also failed to state that the quality of its products was already subpar because its No. 3 Hair Perfector product had contained lilial and that its "inability to continue to compete effectively in key countries around the world" had already materialized because of the E.U.'s ban on lilial.

120.   The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104, 114, 118.

121.   Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further

rendering themselves personally liable to the Company for breaching their fiduciary duties.

122. The Offering Documents stated as *potential* risks, certain risks that had already materialized or were substantially likely to do so regarding the Company's ability to address "challenges, risks and difficulties described elsewhere in this 'Risk Factors' section" that "could cause [Olaplex's] net sales growth to slow or decline and may adversely affect our margins and profitability." The Offering Documents stated:

> Our recent rapid growth may not be sustainable or indicative of future growth, and we expect our growth rate to ultimately slow over time.

> We have experienced significant and rapid growth. Net sales increased from $148.2 million in 2019 to $282.3 million in 2020. For the six months ended June 30, 2020 and 2021, we had net sales of $99.6 million and $270.2 million, respectively. Our historical rate of growth may not be sustainable or indicative of our future rate of growth, and in future periods, our net sales could grow more slowly than we expect or decline. ***We believe that continued growth in net sales, as well as our ability to improve or maintain margins and profitability, will depend upon, among other factors, our ability to address the challenges, risks and difficulties described elsewhere in this "Risk Factors" section. We cannot provide assurance that we will be able to successfully manage any such challenges or risks to our future growth. Any of these factors could cause our net sales growth to slow or decline and may adversely affect our margins and profitability. Even if our net sales continue to increase, we expect that our growth rate may slow for a number***

*of other reasons, including if there is a slowdown in the growth of demand for our products, increased competition,* a decrease in the growth or reduction in the size of our overall market or if we cannot capitalize on growth opportunities. Failure to continue to grow our net sales or improve or maintain margins would adversely affect our business, financial condition and results of operations. You should not rely on our historical rate of growth as an indication of our future performance.

123.    The statements in the paragraph above were each inaccurate statements of material fact when made because they only noted the potential negative impacts on Olaplex's business, financial condition, and results of operations. At the time the Offering Documents were filed, Olaplex knew that its competitive advantage was significantly likely to be impacted as the result of the lilial issue.

124.    The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104, 114, 118, 122.

125.    Furthermore, the Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

126.    The Offering Documents also described as potential risks, certain risks that had already materialized or were significantly likely to do so associated with the fluctuations of the Company's quarterly financial results and resulting declines in the Company's stock price due to the risk factors mentioned in ¶ 122 and other reasons, including Olaplex's "success in engaging existing customers and consumers and

attracting new customers and consumers" and "the impact of competitive developments." Specifically, the Offering Documents stated:

> *Our quarterly results of operations may fluctuate, and if our operating and financial performance in any given period does not meet the guidance that we have provided to the public or the expectations of our investors and securities analysts, the trading price of our common stock may decline.*
>
> *Our quarterly results of operations may fluctuate for a variety of reasons, many of which are beyond our control. These reasons include those described in these risk factors as well as the following:*
>
> - fluctuations in product mix;
> - our ability to effectively launch and manage new products;
> - fluctuations in the levels or quality of inventory;
> - fluctuations in capacity as we expand our operations;
> - *our success in engaging existing customers and consumers and attracting new customers and consumers;*
> - the amount and timing of our operating expenses;
> - the timing and success of new product launches and expansion into new geographic markets;
> - *the impact of competitive developments and our response to those developments;*
> - the impact of the COVID-19 pandemic;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- our ability to manage our existing business and future growth; and
- economic and market conditions, particularly those affecting our industry.

***Fluctuations in our quarterly results of operations may cause those results to fall below the guidance that we have provided to the public or the expectations of our investors and securities analysts, which could cause the trading price of our common stock to decline.*** Fluctuations in our results could also cause a number of other problems. For example, analysts or investors might change their models for valuing our common stock, we could experience short-term liquidity issues, our ability to retain or attract key personnel may diminish and other unanticipated issues may arise.

In addition, we believe that our quarterly results of operations may vary in the future and that period-to-period comparisons of our results of operations may not be meaningful. You should not rely on the results of one quarter as an indication of future performance.

127. The statements in the paragraph above were each inaccurate statements of material fact when made because they only noted the potential negative impacts on the Company's business, financial condition, and results of operations. Olaplex knew that the Company's results of operations was significantly likely to not meet the guidance the Company provided in the Offering Documents and that the value of its common stock would decline as because of the lilial issue.

128. The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104, 114, 118, 122, 126.

129.   Furthermore, the Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

### D.   The Offering Documents Contained Misstatements and Omissions About the "Clean" Nature of Olaplex's Products

130.   The Offering Documents failed to disclose that Olaplex's best-selling product, No. 3 Hair Perfector, contained an ingredient that had recently been classified as a reprotoxic substance and was being banned by the E.U. due to its infertility risks. Instead, the Offering Documents misleadingly touted Olaplex's products as "clean"— *i.e.*, that they do not contain any "harmful ingredients," including parabens, sulfates SLS (sodium lauryl sulfate), and SLES (sodium laureth sulfate), phthalates, mineral oils, formaldehyde, and other potential toxins and allergens.

131.   As a result, the Offering Documents contained materially false and misleading statements and omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared following the rules and regulations governing their preparation.

132.   The Offering Documents misleadingly touted Olaplex's focus on "produc[ing] clean products" without "harmful ingredients," without disclosing that Olaplex's best-selling No. 3 Hair Perfector product was formulated with lilial, which had been classified as a reprotoxic chemical and was being banned in the E.U. due to its infertility risks. Specifically, the Offering Documents stated:

Commitment to Social and Environmental Consciousness

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*    *    *

> *Environmental Sustainability.* We continue to explore ways to reduce our carbon footprint and to contribute to a more sustainable future for our planet. One of our key initiatives is to limit the use of secondary packaging in which our products are sold. We believe that between 2015 to 2021 we avoided the use of approximately 2.9 million pounds of paper packaging, which we believe prevented approximately 23 million pounds of greenhouse gas from being emitted into the environment, conserved approximately 37 million gallons of water and saved approximately 29,000 trees from deforestation, as compared to manufacturing, packaging and distribution alternatives. In addition, ***we strive to produce clean products that exclude certain harmful ingredients.*** These efforts are well recognized in the industry, with OLAPLEX being one of only 21 haircare brands accredited with the "Clean at Sephora" designation, as of July 31, 2021.

133. The statements above were each inaccurate statements of material fact when made because they misleadingly touted the Company's production of clean products that exclude harmful ingredients.

134. The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104, 114, 118, 122, 126, 132.

135. Furthermore, the Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further

rendering themselves personally liable to the Company for breaching their fiduciary duties.

136.    The Offering Documents also touted Olaplex's ability to meet consumer demand for "health conscious" hair products, while failing to disclose that the Company's No. 3 Hair Perfector product had contained lilial, which was being banned in the E.U. Specifically, the Offering Documents stated as follows under the title *Consumers are Increasingly Focused on Health and Wellness*, in relevant part:

> Several significant tailwinds support the long-term growth prospects of the haircare market. The way our consumers feel about their hair has a strong impact on how they perceive themselves; we believe that continued focus on personal appearance and wellness will drive increased spend in the category. We believe consumers are also becoming increasingly health-conscious, **generating a high demand for clean, technology-backed beauty products** that achieve results, and that the importance of hair health has driven increased willingness among our consumers to invest in premium-quality products. **Our offerings,** which are able to deliver results after the first use, **position us well to meet this rising consumer demand.**

137.    The statements above were each inaccurate statements of material fact when made because they misleadingly touted the Company's production of clean products and failed to disclose that the Company's No. 3 Hair Perfector product had contained lilial.

138.    The Offering Documents failed to disclose significant, then-existing material events and adverse trends or uncertainties that Olaplex had already been facing at the time of the IPO and/or was significantly likely to face as described in ¶¶ 88-89, 104, 114, 118, 122, 126, 132, 136.

139.   Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

140.   The Offering Documents further misleadingly touted under the title *Synergistic Channel Strategy Underpinned by Our Omni-Channel Approach* that "[s]ince our first product launch, we have focused on developing clean, technology-based beauty products and created powerful engagement between professional hairstylists and our consumers, which has driven strong organic growth."

141.   The above referenced paragraph is false and misleading for the reasons stated in ¶¶ 88-89, 104, 114, 118, 122, 126, 132,136, 140.

142.   Furthermore, the Individual Defendants failed to, and caused the Company to fail to, rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

### E.   Events After the IPO Demonstrate that the Offering Documents Were Materially False and Misleading at the Time of the Offering

143.   Olaplex completed its IPO in September 2021. However, the Offering Documents failed to disclose that the Company's No. 3 Hair Perfector product contained the reprotoxic ingredient, lialil, which the E.U. had banned as unsafe because of its links to infertility risks. The ban was to take effect less than six months after the IPO, and the Company continued to sell its No. 3 Hair Perfector product containing lilial until at least January 2022.

144.   Instead of disclosing to investors that the E.U. had banned the use of lilial in its No. 3 Hair Perfector product and the reprotoxic risks associated with it, Olaplex quietly removed lilial from the product in June 2021, shortly before the IPO.

145.   On November 10, 2021, the Company issued a press release announcing its third quarter 2021 financial results, reporting that Olaplex had experienced an 81% increase in net sales, which the Company stated "reflect[s] strong growth across all channels of distribution driven by increased velocity of existing products, the launch of new products, and the addition of new customers, both in the U.S. and Internationally."

146.   On the same day, during the earnings call to discuss the quarterly results, in response to an analyst question on Olaplex's distribution into salons and Ulta Beauty, Defendant Wong stated that "brand building" was one of Olaplex's "key growth considerations," thus reiterating how crucial its brand reputation was to Olaplex's financial success. Specifically, Wong stated, in relevant part:

> As to what else are we going to go, in terms of expansion of distribution in Specialty Retail. As I've mentioned, we just have so much with our core accounts that we really want to be the #1 hair care brand of the top 5 beauty brands in their offering so that we become an anchor brand for them. And when we are anchored brands for any of our partners, we then are able to really partner up on marketing, brand building as well as growth. So those are key growth considerations for us, in our partnership with our existing players.

147.   Further, in response to an analyst's question about the Company's methods for building brand recognition and Olaplex's consumer base, Defendant Wong reiterated the importance of community and social media engagement to Olaplex's growth prospects, stating:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

        I think, what is important to note is, we are very focused on what really builds long-term growth, and [what] studies have shown us that the three sources of truth, when it comes to brand building and marketing awareness, first and foremost, is the -- is -- especially for hair, is where they want to take recommendations from their professional hair stylist. So building that community will continue to be our focus. So with that said, the #2 area, the #2 source of truth, is product reviews and word of mouth, which is the third one, which means that we are already in that space through our social media engagement connection and conversion, with our performance marketing, whether it's via digital media or search engine optimization. We will continue all of this interactive tools to connect, engage and convert our customers. And if we continue to do that, the marketing, branding and the awareness build would just be a lot more organic as well as strategic because this is in partnerships, not only with what we are doing, but driving traffic to both online and offline retailers that we partner with.

19
20

148.   During the related earnings call, in response to an analyst's question regarding Olaplex's distribution to salons and Ulta Beauty, Defendant Wong stated:

21
22
23
24
25
26
27

        As to what else are we going to go, in terms of expansion of distribution in Specialty Retail. As I've mentioned, we just have so much with our core accounts that we really want to be the #1 hair care brand of the top 5 beauty brands in their offering so that we become an anchor brand for them. And when we are anchored brands for any of our partners, we then are able to really partner up on marketing, brand building as well as growth. So

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

those are key growth considerations for us, in our partnership with our existing players.

149.   In response to another analyst's question about the Company's methods for building brand recognition and Olaplex's consumer base, Defendant Wong stated::

I think, what is important to note is, we are very focused on what really builds long-term growth, and [what] studies have shown us that the three sources of truth, when it comes to brand building and marketing awareness, first and foremost, is the -- is -- especially for hair, is where they want to take recommendations from their professional hair stylist. So building that community will continue to be our focus.

So with that said, the #2 area, the #2 source of truth, is product reviews and word of mouth, which is the third one, which means that we are already in that space through our social media engagement connection and conversion, with our performance marketing, whether it's via digital media or search engine optimization.

We will continue all of this interactive tools to connect, engage and convert our customers. And if we continue to do that, the marketing, branding and the awareness build would just be a lot more organic as well as strategic because this is in partnerships, not only with what we are doing, but driving traffic to both online and offline retailers that we partner with.

I think, first and foremost, if you look at the Professional Beauty Association data, they will let you know that there are 800,000 professional health stylers, as registered with them. And we have well over 250,000 that is in a constant engagement and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

connection with us on our Facebook group, meaning that they are interacting with us. They are engaging with us. They are producing content for us. So we feel very strongly that, that continuous community built, will continue to serve us very well.

150.   The above statements identified were materially false and misleading and failed to disclose material adverse facts as described in ¶¶ 88-89, 104, 114, 118, 122, 126, 132,136, 140, 149.

## **THE TRUTH BEGINS TO EMERGE**

151.   On February 27, 2022, Kay, a hair and skin influencer on the social media platform TikTok with over 227,000 followers at the time, posted a video titled, "When you find out Olaplex is going to be banned in the EU + UK next month" expressing her disappointment that Olaplex products may be banned in the E.U. and the U.K.

152.   The video revealed for the first time to consumers and investors that Olaplex's products contained lilial, which was banned in the E.U. due to safety concerns. The video went viral and has since been viewed over 1.1 million times, generated over a thousand comments, and has been shared over 3,500 times.

153.   On the same day, Kay posted a second video on TikTok explaining that "[t]here are reports that Olaplex is being banned in the E.U. and the U.K., and that is because of this ingredient [pointing to a Google search of lilial], which has been linked to infertility." Kay further noted that "[s]ome sources say it has already been reformulated" to remove lilial. This video has since been viewed over 223,800 times, shared over 2,000 times, and garnered over 9,000 likes and 380 comments.

154.   The videos triggered immediate public commotion and backlash against Olaplex for its undisclosed use of such a potentially toxic ingredient in its supposedly "clean" product. Various TikTok users rapidly commented on the Kay videos, expressing their shock and concern about Olaplex's use of such an ingredient.

155.   On or about the same day, Olaplex used its official TikTok account to respond to the video, stating that "OLAPLEX No. 3 Hair Perfector is not banned in the UK" and that "Olaplex takes the health of our consumers and regulatory compliance seriously."

156.   Traditional news media outlets also widely reported on the controversy in numerous subsequent articles published online.

157.   On February 28, 2022, Olaplex posted a video on its official social media accounts, including Facebook and Instagram, "in response to the recent social [media] posts" about lilial, "which Olaplex no longer uses in any of its products."

158.   The video showed Lavinia Popescu ("Popescu"), Olaplex's Chief Scientist and Vice President of Research and Development ("R&D") and Regulatory, addressing the E.U. regulatory ban and explaining that Olaplex had removed lilial from its No. 3 Hair Perfector globally, acknowledging that she intended to "address this lilial subject that recently the entire industry is talking about."

159.   In the video, Popescu explained that "until last year, this ingredient [lilial] was classified as an allergen" and that "an allergen is a substance that could cause an allergic reaction and we were very aware about this problematic, to say, function of the lilial" ingredient. Popescu further stated that "in the past, when we [found] out that eventually this ingredient can have other side effects, we decided to take it out." Popescu reiterated that "I want to be clear and I want to explain that we decided to take lilial out from our products, not only in the E.U. where in this moment [it] is banished, we decided to take it out globally." Popescu later stated that "in this moment, Olaplex is lilial-free."

160.   These statements confirmed that the potentially "problematic" side effects of lilial, including infertility risks and allergic reactions, existed prior to the IPO. The Individual Defendants' failed to disclose these facts in the Offering Documents as described above.

161.   On March 1, 2022, the news outlet *The Independent* published an article titled "Olaplex removes lilial from No. 3 Hair Perfector following EU ban," discussing the E.U. ban on lilial due to the fertility safety concerns and the recent alarm sparked on social media regarding Olaplex's use of the ingredient in one of its premium products. The article noted that Kay's TikTok video had "received almost one million views."

162.   The article also stated that "[i]n a statement to the Independent, Olaplex said it had now removed the ingredient from its No. 3 Hair Perfector across the world, adding that Olaplex products containing lilial had not been sold in the UK since January." The article quoted a "spokesperson" from Olaplex who further explained that "[w]hile this phase out is limited to the EU, out of an abundance of caution, Olaplex proactively removed lilial from our No. 3 Hair Perfector globally. Since January 2022, Olaplex no longer sold products using lilial in the UK or EU."

163.   On March 2, 2022, the *New York Post* published an article titled "Banned Olaplex ingredient linked to infertility sparks TikTok backlash." That article stated that "Olaplex is a staple at trendy upscale salons, but hair-raising rumors that a now-banned ingredient causes infertility have racked up 30 million views on TikTok." The article explained that the Olaplex brand went viral after reports on social media in the preceding days that its No. 3 Hair Perfector product, which "is arguably their most popular in the line—evidenced by the more than 30 million views tied to the social media hashtag #olaplexno3 on TikTok alone," was subject to the E.U. ban on lilial due to safety concerns with fertility. The article also confirmed that the public did not previously know of this lilial issue with an Olaplex product, noting that "it came as a shock to the hair-obsessed that Olaplex would be revealed as an infertility risk" due to this ingredient.

164.   On March 3, 2022, a group of Olaplex consumers filed a class action lawsuit in the Superior Court of Quebec against Sephora Canada and Olaplex in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

connection with the Company's use of lilial in its No. 3 Hair Perfector product. The lawsuit, which is still pending, alleges that Olaplex failed to inform consumers of the serious health risks associated with the lilial ingredient, which included potential infertility and allergic reactions, based on the E.U.'s SCCS's opinion described above, including its finding that lilial is linked to reproductive toxicity. The complaint also noted that it appeared that Olaplex had removed lilial from its No. 3 Hair Perfector "at some point in June 2021," citing Olaplex's current Safety Data Sheet posted on the Company's website, which was updated on June 27, 2021. The complaint further alleges as follows regarding Olaplex's removal of lilial before the IPO:

> Olaplex tried to very subtly remove this dangerous chemical from Olaplex No. 3 Hair Repair Perfector in June of 2021 and hoped that its customers would never realize. It only acknowledged and spoke publicly about the safety issues after its use of lilial in Olaplex No. 3 Hair Perfector went viral on social media in February 2022."

165. On this news, the Company's stock price fell $0.90 per share, or 5.41%, to close at $15.75 on March 3, 2022, and following an intervening weekend, the Company's stock price fell an additional $1.86 per share, or 11.68% to close at $14.06 on March 7, 2022.

166. On March 7, 2022, Piper Sandler reported that "[f]ollowing the No. 3 controversies that have been taking over headlines this past week," analysts were remaining "watchful of the future competitive environment" of Olaplex.

167. On March 7, 2022, J.P. Morgan reported that "OLPX shares have been under meaningful pressure YTD (OLPX -51.7% vs. XLP -3.4% and SPX -11.8%), which we attribute to some combination of investor concerns regarding an Omicron related slowdown in underlying consumption, unfavorable headlines around past product formulations and the broader market rotation away from growth names."

168.   On March 8, 2022, the Company issued a press release announcing its fourth quarter and full year 2021 financial results ending on December 31, 2021. Therein, the Company reported a net sales growth of over 78% in the fourth quarter and 112% for the full year.

169.   During the related earnings call, Defendant Wong stated:

> I also want to address the misinformation surrounding OLAPLEX and lilial upfront in [lieu] of taking questions on it during the Q&A. In the last 10 days, misinformation on OLAPLEX has surfaced with regards to lilial in our products. We have been actively communicating across all our channels to ensure that our customers have access to the facts and to alleviate any anxiety that has been caused by this misinformation.
>
> Lilial is a fragrance ingredient commonly found in beauty and household products. In September of 2020, the EU regulatory authority announced their intent to phase out the use of butylphenyl methylpropional, which is lilial, by March of 2022, out of concern that lilial when used at certain quantities could have negative impact on women's fertility and reproductive system if ingested. In response to the EU's phaseout of lilial, we no longer produce products with lilial.
>
> Prior to the EU's phaseout, our No. 3 Hair Perfector product contained very small amounts of lilial to enhance the product's fragrance. Lilial was never an active or functional ingredient in our products. And independent medical and chemist experts have confirmed that the very small amount of lilial, 0.0119%, previously used by OLAPLEX in its [rinse-off] No. 3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Hair Perfector product, had no impact on fertility and the reproductive system.

We have provided updated and detailed information on our website under the FAQs. There is also a link to an article citing experts from the medical and science community as well as the original study that led to the phaseout of lilial.

We take pride in our investment in R&D and our commitment to ensuring that our products are designed and produced with the safety and health of the consumer at heart. And we will continue to abide by health and safety standards as they evolve. And as we have always been, we will continue to proactively and transparently communicate with our customers and the market to ensure they are well informed about our products.

170.    On April 19, 2022, Olaplex filed a Schedule 14A with the SEC ("2022 Proxy Statement"). Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Walden, E. White, M. White, and Zusi solicited the 2022 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act. The 2022 Proxy Statement contained material misstatements and omissions.

171.    The 2022 Proxy Statement asked Olaplex stockholders to vote to, among other things, reelect Defendants Findlay, Walden, M. White, and Zusi to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2025.

172.    Under the heading "Code of Conduct," the 2022 Proxy Statement stated: We have adopted a written Code of Conduct and Ethics, applicable to all of our directors, officers, employees and "Business Associates", which includes brand ambassadors,

1   brand advocates, vendors and contractors performing services or
2   carrying out activities on behalf of the Company. The Code of
3   Conduct and Ethics is designed to ensure that our business is
4   conducted with integrity. It covers, among other things,
5   professional conduct, conflicts of interest, accurate
6   recordkeeping and reporting, public communications and the
7   protection of confidential information, as well as adherence to
8   laws and regulations applicable to the conduct of our business.
9   In the event that any substantive amendment is made or any
10  waiver is granted, the waiver will be posted on our Investor
11  Relations website.

12  173.   Regarding the Company's Risk Oversight, the 2022 Proxy Statement
13  stated:

14      The Board has oversight responsibility for the systems
15      established to report and monitor the most significant risks
16      applicable to Olaplex. The Board believes that evaluating the
17      executive team's management of the various risks confronting
18      Olaplex is one of its most important areas of oversight. In
19      accordance with this responsibility, the Board administers its risk
20      oversight role directly and through its committee structure and
21      the committees' regular reports to the Board at Board meetings.
22      The Board reviews strategic business and corporate plans,
23      oversees the Company's risk management and mitigation
24      activities, monitors the administration of policies, and safeguards
25      the integrity of the Company's business operations and financial
26      reporting. The Audit Committee oversees financial and
27      accounting matters, including financial reporting, disclosure,

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

internal controls over financial reporting, ethics and compliance programs, and regulatory compliance. In addition, the Audit Committee also oversees and reviews with management the Company's policies, procedures and practices with respect to risks related to information security, cyber security and data protection. The Compensation Committee oversees and assesses the adequacy of, and any risk inherent in, the Company's compensation and benefits, as well as reviews and administers compensation programs, plans and arrangements.

174. The 2022 Proxy Statement was materially misleading because it failed to disclose that (i) although Olaplex claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants had violated the Code of Conduct; (ii) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Olaplex to issue false and misleading statements; and (iii) the Individual Defendants allowed the Insider Trading Defendants to sell stock at artificially inflated prices while in possession of material non-public information.

175. The 2022 Proxy Statement was further materially misleading because it failed to disclose, *inter alia*, to investors that (i) Olaplex opted to keep its No. 3 Hair Perfector product containing lilial in inventory, which was likely to cause a surplus in inventory and place Olaplex and its distributors at a high risk position if the Company's sales were to slow down; (ii) Olaplex knew that the E.U.'s ban on lilial would have detrimental effects on Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position; (iii) because the Company was heavily dependent on social media channels to drive sales and marketing and build the overall brand reputation of the Company, Olaplex, could be

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and, in fact, was damaged by the negative publicity and reputational damage to the Olaplex brand; (iv) the significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand; and (v) consequently, the Company lost sales, customers, market share to competitors, and revenue. As a result of the foregoing, the Company's public statements were materially false and misleading.

176.   Furthermore, the 2022 Proxy Statement was also false and misleading because the Individual Defendants failed to implement and oversee effective internal controls to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

177.   On May 11, 2022, the Company issued a press release announcing its first quarter 2022 financial results, revealing a slowing growth in net sales that declined from 78% in the prior quarter to 58% year-over-year.

178.   On the same day, the Company filed its first quarter financial results on Form 10-Q with the SEC. Therein, the Company admitted that it had reformulated its No. 3 Hair Perfector product to remove lilial in June 2021.

> Our costs of sales increase $20.5 million or 83% to $45.0 million in the three months ended March 31, 2022 from $24.5 million in the three months ended March 31, 2021, due to a $16.9 million increase driven by a growth in sales volume, a $4.3 million increase due to the inventory write-off and disposal costs related to unused stock of a product that the Company reformulated in

June 2021 as a result of regulation changes in the E.U. In the interest of having a single formulation for sale worldwide, the Company reformulated on a global basis and is now disposing of unused stock. In addition, cost of sales was partially offset by a $0.7 million decrease in the amortization of our acquired patented formulations.

179.  On this news, the Company's stock price fell $0.78 per share, or 6.03%, to close at $12.16 on May 10, 2022.

180.  During the same call, Defendant Tiziani stated as follows regarding Olaplex's higher level in inventory:

Inventory at the end of Q2 2022 was $140.3 million compared to $98.4 million at year-end 2021 and $117.5 million at the end of Q1 2022. We have strategically maintained a higher level of inventory months on hand to support the growth in our business, compensate for longer transit times overseas and to help mitigate macro supply chain risks. We remain comfortable with our inventory position and our ability to meet future demand.

181.  In response to a follow-up question regarding inventory, Defendant Tiziani admitted that the Company had decided in mid-2021—the same time Olaplex was reformulating its No. 3 Hair Perfector product and before the IPO—to hold more inventory on hand than usual:

We're happy with the level and quality of the inventory we have on hand. It's been a big part of our strategy to maintain excellent customer service, which we've been able to do over the past several years. And that means we made a strategic decision to hold more months on hand of inventory. We made that decision way back in the middle of last year. It served us very well. That's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

exactly what we're continuing to do here. And that month on hand level of inventory remains pretty stable.

182.  On this news, the Company's stock price fell $1.63 per share, or 9.99%, to close at $14.68 on August 9, 2022.

183.  On September 29, 2022, Piper Sandler released an analyst report that downgraded Olaplex shares "as a result of further work . . . [that] revealed that competition and misinformation pose growing risks to the company." The report discussed survey results of 150 salons in the top 50 U.S. metropolitan areas.

184.  The Piper Sandler report concluded that Olaplex's market share was decreasing as "[c]ompetition has and continues to be on the rise in the hair repair category, particularly K18, which has risen to the #2 alternative hair repair product in our survey." The report directly attributed the sales drop and market share loss to the lilial and the related negative reviews discussing hair damage, which the report called "misinformation," which started at the beginning of 2022.

185.  The Piper Sandler report asked and answered, "[b]ut, why are people switching from Olaplex? Mainly misinformation," noting that consumers were "listening to what's most buzz-worthy on social media."

186.  The Piper Sandler report further stated as follows regarding the effects of misinformation on the Company's competitive growth:

> ***A key factor we see driving this competitive growth and shift away from Olaplex is a notable amount of misinformation out there.*** As we show below from our September Olaplex Salon Survey, there were a number of negative reviews mentioned by the hair stylists surveyed, however a number of these reviews are a result of error or misinformation. . . . Additionally, we believe that [product] misuse could be leading to some other ***negative reviews we're seeing regarding damage, such as dryness, breakage, and hair loss***.

\*     \*     \*

*The quick spread of misinformed infertility concerns arising from the lilial ingredient in No. 3 (back in late-February/early March) is a clear example of how quickly negative press can spread*, and while we applaud management's quick actions to put out the fire, this does show the power of the press. Recall, OLPX stock dropped ~6% the day the issue was brought to the public eye via social media.

\*     \*     \*

**Lowering Forward Estimates**

So, where do we go from here? While we understand our survey work is not representative of the entire population, we do view it as a good indicator of general trends. *Some salons are stopping use and sales of Olaplex products, competition is certainly growing, and there are clear concerns out there arising from misinformation*. We believe heavier investments in marketing and education are needed from Olaplex to offset these headwinds. As such, we are lowering our forward estimates today on both the top and bottom lines, and we are now sitting below the Street across all metrics.

187.   The Piper Sandler report also stated that analysts were "more cautious on OLPX given some of the risk factors that have come up, particularly negative reviews" pertaining to hair loss. Piper Sandler further stated that "marketing and education spend will need to increase notably to correct these misconceptions and slow share loss to competitors."

188.   On this news, Olaplex's common stock fell $1.33 per share, or 12.15%, from a close of $10.95 per share on September 28, 2022, to close at $9.62 per share on September 29, 2022.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

189.   On October 18, 2022, the Company issued a press release announcing its preliminary financial results for the third quarter of 2022, revealing that the Company's sales slowdown had continued and reported net sales growth of only 9.2% in the third quarter of 2022, with sales decreasing 4% in the U.S.

190.   The Company also announced a revised guidance for the 2022 fiscal year of sales between $704-$711 million, compared to Olaplex's prior guidance of $796-$826 million.

191.   The press release attributed this slowdown, in part, to "increased competitive activity including discounting, and a moderation in new customer acquisition." The press release also quoted Defendant Wong as stating that "[w]e are disappointed to lower our fiscal 2022 guidance" and that Olaplex had "identified and put actions in place to accelerate demand."

192.   On the same day, Olaplex filed with the SEC a current report on Form 8-K that also announced the departure and resignation of Defendant Walden, the COO, effective immediately.

193.   During the related investor call, Defendant Wong attributed the lower full-year 2022 guidance on net sales, in part, to "pressure on [Olaplex's] ability to attract new consumers." Specifically, Defendant Wong stated the following:

> We believe there are two key reasons for the change in growth trajectory. First, we have seen a slowdown in sell-through momentum. We believe this has been driven by a combination of factors, including macroeconomic pressures have impacted both PRO stylist and consumers with the most pronounced impact being on our U.S. PRO stylist. U.S. Pros are buying less and buying closer to need as they report clients lengthening the time between salon visits and spending less for services and take-home products.

In addition, we have seen increased competitive activity in our highly attractive core bond building space. Both new comers and large hair care incumbents have extended into our category and have intensified promotional behavior. Olaplex has made a strategic decision to avoid over promotion. Instead, prioritizing spending behind long-term sustainable brand health.

In this context, it is important to note that we do not believe that any of our competitors represents a lasting threat to our competitive position. Moreover, while we believe our customer retention is best in class, the macroeconomic impact and competitive activity has put pressure on our ability to attract new consumers to the brand. The second driver of our change in performance is inventory rebalancing across partners. Our retail, DTC and PRO B2B customers are experiencing the same macroeconomic pressures and being impacted by the same sell-through trends. While at the same time, increasing their confidence in the supply chain.

194. During the same call, Defendant Tiziani attributed the revised guidance to the following:

In Q3, the miss to our expectations and shipments was disproportionately driven by 2 customer groups: U.S. professional and a U.S. pure-play e-commerce customer within DTC. These linked to the year-over-year sales declines in the professional and DTC channels as well as the pressure we saw specifically in the U.S. We saw a reduction in U.S. professional orders as we believe macroeconomic concerns are impacting the stylist community and our key distributors chose to pull back on

69

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    inventory levels in response to the lower sell-through trends.
2    Despite this, for third-party data, which we receive on a 1-quarter
3    lag, I want to stress that through the second quarter, we are still
4    gaining market share year-over-year in the U.S. professional
5    channel.

6        We've also seen a deceleration of sell-through trends in
7    the U.S. retail and DTC channels related to slower market growth
8    and increased competitive activity, including from discounting.
9    In the third quarter, this was most acutely felt at a key U.S. DTC
10    customer, which reduced orders to lower inventory levels, in part
11    to meet lower targeted levels of inventory on hand. I will also
12    note that Q3 net sales in retail, DTC and our International
13    Professional business, benefited from a higher selling of holiday
14    kits in 2022 versus 2021, which is part of what's driving retail,
15    DTC and international net sales growth to be stronger in Q3 than
16    our projection for Q4.

17    195.    Defendant Tiziani further explained that the Company would "alter[]" its
18    2021 strategy of holding onto more inventory and instead "lower our own inventory
19    to target levels."

20    196.    On this news, the Company's stock price fell $5.55 per share, or 56.69%,
21    to close at $4.24 on October 19, 2022.

22    197.    On November 9, 2022, Olaplex reported its full third quarter 2022
23    financial results and affirmed the disappointing preliminary results disclosed in the
24    October 18, 2022 preliminary report. The earnings announcement confirmed that the
25    Company's sales had greatly deteriorated in the third quarter of 2022, as Olaplex
26    reported a further slowdown in net sales growth of only 9.2% in the quarter, with sales
27    decreasing 4.3% in the U.S.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

198. On the same call, Defendant Tiziani further explained that the "softer demand" Olaplex was experiencing in the U.S.'s Professional and DTC channels was, in part, due to an increase in market competition. Specifically, Defendant Tiziani stated as follows:

> Professional channel sales declined 16% to $63 million versus a 58% increase last year, as our U.S. distributor partners reduced purchases to adjust inventory levels given softer demand from stylists, which we believe is partially driven by macroeconomic concerns. And our direct-to-consumer channel sales were down 2.6% to $39.3 million, following an 87% increase last year, due to slower sell-through related to weakening market growth and increased competitive activity, including discounting.
>
> In the third quarter, we also saw a key U.S. DTC customer reduce orders to meet lower targeted levels of inventory on hand. By geography, international led our growth with a 27.8% increase driven by strong contributions from the U.K., Italy, France, Germany, Canada and our emerging cross-border e-commerce business in China. The U.S. declined 4.3%, driven by the aforementioned pressures in the professional and DTC channels.

199. Defendant Tiziani noted that Olaplex's inventory was higher than expected and that the Company would be rebalancing its inventory to lower inventory levels given this reduced demand for Olaplex products. Defendant Tiziani's statements contradicted the Company's pre-IPO inventory strategy, pursuant to which the Company held multiple months of inventory. Specifically, Defendant Tiziani stated:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Now turning to the balance sheet. Inventory at the end of the third quarter was $151.3 million compared to $140.3 million at the end of the second quarter and $98.4 million at the end of 2021. As mentioned on our October call, this is higher than originally planned due to our lower sales delivery in the quarter. We have already altered our sourcing plans and slowed procurement to match the new sales forecast. Over time, this will lower our own inventory to target levels, and the timing of this will depend on sell-through trends.

* * *

As it relates to the fourth quarter, while we have actions in place to accelerate growth, we are still planning for an increasingly difficult macroeconomic operating environment and for further inventory rebalancing by several key customers related to our slower sales momentum. Based on today's macro environment and our current forecast, we expect this inventory rebalancing to normalize by the end of the first quarter 2023 in our professional and specialty retail channels.

200.   With respect to the Company's forthcoming fourth quarter results, Defendant Tiziani signaled that the slowdown in sales was likely to continue because of the weakening consumer demand:

As a reminder, our guidance for Q4 also reflects that we will not be able to lap the robust sales lift that we experienced during the fourth quarter holiday period last year when we grew 78%, benefiting from significant replenishment orders across our specialty retail and DTC channels at a time when we believe

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

consumer demand was stronger and some of our competitors struggled with consistent supply.

201.   During the call, multiple analysts commented on the Company's poor sales performance in the quarter and recognized that Olaplex's poor results were driven by increased competition from competitors who were taking advantage of the fact that the Company was no longer the most popular brand.

202.   During the call, an analyst noted that "it sounds like September really slowed down a lot" and that it was "a pretty bad September," asking for more color on what happened. In response, Defendant Tiziani admitted that "[c]learly, we did see a slowdown in September" and mentioned "the marketing activations [that] we're putting in place" in the hopes of improving demand.

203.   Another analyst commented that "[c]learly, we all got a little too enthusiastic and excited about the sales trajectory of the business," and noted that there was "a cohort [of] consumers who probably . . . came in because there was hype behind [Olaplex's products], right? Like it was a shiny new toy. And now, there are other shiny toys that are out there." In response, Defendant Wong assured analysts that the Olaplex "brand fundamentals are strong," and noted that consumers are "looking for brands that they can trust, not just on marketing hype or promises that they cannot deliver."

204.   After the earnings call, analysts further noted the Company's dramatic slowdown in sales.

205.   On November 10, 2022, J.P. Morgan's analyst report on the Company stated that "we believe the company will face challenging four quarters head with deep deceleration in sales performance in Q322, followed by negative sales growth in Q422. The increased competition and excess inventory at OLPX and retailers will likely remain a significant headwind over the next 12 months."

206.  On February 9, 2023, a group of consumers filed a product liability lawsuit in the United States District Court for the Central District of California against Olaplex for negligence and false advertising, alleging that Olaplex's products contained allergens and irritants, including lilial, that caused hair loss and other damage to the hair and scalp. The lawsuit specifically included allegations that Olaplex's products were unsafe because they contained lilial, which the E.U. had banned due to concerns about its impact on fertility, and that Olaplex thus had removed lilial from the Olaplex No. 3 Hair Perfector product ingredient list in June 2021 due to such concerns.

207.  This consumer lawsuit prompted another round of negative publicity in the press and on social media. On February 10, 2023, *BestLife* published an article titled "Popular Hair Care Brand Olaplex Under Fire for Allegedly Causing Hair Loss," which reported that "Olaplex is facing a lawsuit from a group of customers who allege that these products cause hair loss." The article, and numerous others, directly linked these consumer claims to the prior lilial safety revelations. Specifically, the *BestLife* article stated:

> [T]he plaintiffs claim that Olaplex knowingly uses ingredients that make products 'unreasonably dangerous.' Lilial, which can cause allergic reactions, was used in Olaplex products until last year, Insider reported. The chemical was banned from hair products in the European Union in 2020. Olaplex removed lilial (which can also cause infertility issues) in 2021, and put out a new formulation in 2022, per Today.

208.  The statements identified in ¶¶193-195, 198-200, 202-203, 210-211 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects for the reasons stated in ¶¶ 88-89, 104, 114, 118, 122, 126, 132,136, 140.

74

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**THE TRUTH IS REVEALED**

2      209.   On February 28, 2023, Olaplex reported its financial results for the fourth

3  quarter and full-year 2022. The results included a disappointing decrease in net sales

4  by 21.5% for the fourth quarter and only a 17.7% increase in net sales for fiscal year

5  2022, as compared to net sales growth of 112% for fiscal year 2021.

6      210.   During the related earnings call, Defendant Wong explained that Olaplex

7  would need to "reset and stabilize [its] core business with a long-term view" and that

8  it needed to significantly invest in the Company's sales and marketing to try to

9  rehabilitate its damaged brand reputation. Specifically, Defendant Wong stated:

> As disclosed in today's press release, following multiple years of
> strong growth, we expect 2023 net sales down 15% from last
> year and adjusted EBITDA down 32%, in each case, at the
> midpoint of our annual guidance range. This expectation follows
> an analysis of recent business trends, the issues we face and the
> growth opportunities in front of us. Based on this work, we
> realize that we need to invest more to keep pace with our rapid
> growth and current scale. As we look at our plan for 2023 with
> macro uncertainties and quickly changing market dynamics,
> reducing visibility, we see the need to reset and stabilize our core
> business with a long-term view. We are disappointed with this
> outlook and hold ourselves accountable for getting to this
> position and for improving the business. This year, we have a
> clear focus on increasing investments in sales and marketing,
> education and our partner relationships, and we believe this
> initiative will optimize our potential and position Olaplex to
> resume growth in 2024 and beyond.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

211.   Defendant Wong also "acknowledge[d]" the "lessons learned" from Olaplex's disappointing performance in 2022, which included that the Company needed to do more "to defend the brand from the natural competitive intensity that exists in an attractive category" and that "we need to act faster and be better equipped to deal with negative PR and misinformation about our brand, such as has surfaced over the past year." Thus, the Individual Defendants admitted that Olaplex's sales declines in 2022 were directly linked to what they referred to as the lilial "misinformation" issue.

212.   During the same call, Defendant Wong also discussed that "[a]nother key objective this year will be increasing our education and training efforts on the Olaplex brand," particularly in "marketing our core products with an anchor around No. 3 as our hero SKU," noting with respect to this product specifically that there were "opportunities to better educate on the product and how it is utilized." Thus the Individual Defendants indirectly admitted that Olaplex needed to invest tremendous resources to rehabilitate its brand reputation, particularly for its most important product, the No. 3 Hair Perfector.

213.   Defendant Wong also addressed the substantial negative media coverage about Olaplex's products, including more recent claims that its products cause hair loss and breakage because they contained unsafe allergens like lilial:

> To that end, I want to address the recent negative media headlines that claims Olaplex products cause hair loss. So anyone experiencing hair loss and hair breakage, we understand the emotional toll it has and are empathetic to the impact on your well-being. However, Olaplex products do not cause hair loss or hair breakage. Olaplex products are safe and effective as millions of our consumers can happily attest and as evidenced by our

published HRIPT test results. We also recognize the concern that this misinformation may cause our loyal customers, stylists and retail partners when hearing baseless claims about a product they love and trust.

214.    During the same call, Defendant Tiziani further explained that sales for the quarter were "negatively impacted by approximately $29 million at several of our key customers as these customers lowered their orders to rebalance inventory in response to lower levels [of] demand and to target overall lower levels of month on hand than previously carried." Defendant Tiziani further admitted that the disappointing performance was driven by lower consumer "demand in an increasingly competitive environment." Specifically, Defendant Tiziani stated:

By Channel, professional sales declined 3.9% to $54.9 million versus a 9% increase last year, which was in line with our expectations. This decline was driven by reduced purchases by our stylist community in the U.S. and the U.K., partially driven by the tougher macro environment impacting the professional channel. This was evidenced by the latest available Klein data, which showed total market front of salon sales in the U.S. declined by 2% in the third quarter, while Olaplex front of sale sell-through in the third quarter was up 2% compared to last year. Specialty Retail sales decreased 45.3% to $32.6 million, following a robust 332% gain in the prior year period. Performance was below the expectations we provided on our third quarter call, reflecting a softening in replenishment demand in an increasingly competitive environment, including heightened promotional activity during the holiday season. In

1    addition, as we previously communicated, we were lapping the

2    $15 million initial wave of Ulta pipeline fill in Q4 2021.

3    215.   During the call, Defendant Tiziani confirmed that Olaplex continued to

4  rebalance its inventory. Specifically, Tiziani stated:

5    Inventory at the end of the fourth quarter was $144.4 million,

6    down from $151.3 million at the end of the third quarter. The

7    reduction in inventory levels is a result of our decision to alter

8    our sourcing plans and slow procurement to match the new sales

9    forecast, which more than offset building inventory of new

10    SKUs as we prepare for product launches this year.

11
## THE INSIDER TRADING DEFENDANTS SELL
## COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES
12

13    216.   During the period of wrongdoing described above, Olaplex insiders sold

14  Company stock at artificially inflated prices while in possession of material non-

15  public Company information.

16    217.   Defendant Advent, through Defendants Glynn, Mussafer, and M. White

17  sold 68,711,029 shares of Company stock on October 4, 2021, and 10,306,655 shares

18  on October 8, 2023, for total proceeds of approximately $1.57 billion while Olaplex's

19  common stock was trading at artificially inflated prices due to the false and misleading

20  statements alleged herein and while in possession of material non-public Company

21  information.

22    218.   While many of the Company's shareholders lost significant money with

23  the share price dropping substantially, the Insider Trading Defendant sold their shares

24  at artificially high prices and avoided the staggering losses suffered by shareholders.

25    219.   As a result, the Insider Trading Defendant benefitted from the artificial

26  inflation of the price of the Company's stock and the resulting increase in the value of

27  Olaplex stock and stock options they held.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## CONFIDENTIAL WITNESSES IN THE SECURITIES CLASS ACTION CORROBORATE THE WRONGDOING ALLEGED HEREIN

220.   The Securities Class Action interviewed former employees of Olaplex, all of whom corroborated the wrongdoing alleged herein, including that the Company was aware of the E.U.'s efforts to ban lilial because of its potential reprotoxic attributes.

221.   CW-1 in the Securities Class Action was a director at Olaplex from November 2018 through early 2023. CW-1 oversaw product development, procurement, and sourcing, which included bringing new products to market. Early in CW-1's employment, he reported directly to Defendant Wong. During the second half of CW-1's tenure, he reported to Shah Nagree, current Senior Vice President of Operations at Olaplex, who reports to Defendant Tiziani.

222.   CW-1 has purportedly stated that approximately in March 2021 (one year before the E.U. ban took effect and six months before the IPO), CW-1 was informed by a regulatory manager, whose name and exact title could not be recalled but believed was a Senior Manager of Regulatory Affairs, that lilial needed to be removed as an ingredient from Olaplex's products. CW-1 recalled being informed of the change in a group email.

223.   CW-1 also explained that removing lilial as an ingredient was implemented as a "soft change," meaning Olaplex could use up its existing supply of its No. 3 Hair Perfector product containing lilial before phasing it out. CW-1 explained that the reformulation was a soft change because lilial was not banned in the U.S. and the Company could use up its existing supply before changing the formula without a problem.

224.   CW-1 stated that the only real cost of implementing the removal of lilial was scrapping and reprinting the labels because the Company could use up its existing supply before re-formulating. CW-1 added that reformulating the product was easy

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

because lilial was not a main ingredient for the No. 3 Hair Perfector products but served only as a fragrance additive.

225.   In the Securities Class Action, CW-1 further recalled starting to see less demand for Olaplex's products and a drop-off in sales in approximately the Company's second quarter of 2022. CW-1 purportedly added that assessment of the softening sales in the second quarter of 2022 was based on comparison to both the second quarter of 2021 as well as observing month-to-month orders. CW-1 noted that Olaplex had an entire team devoted to analyzing this information, called Planning and Inventory, in addition to its Financial Planning & Analysis staff. Additionally, CW-1 stated that Defendant Wong, Chief Transformation Officer Juliane Park, and Defendant Walden, would know details regarding the impact that the lilial issue had on sales because they and their teams watched those figures.

226. CW-1 also noted the   requirement to increase production to meet increased sales demand until 2022. In CW-1's last full year with the Company in 2022, however, CW-1 observed that suddenly Olaplex's customers were all overstocked on inventory. According to CW-1, the overstock was primarily due to increased competition.

227.   CW-1 stated Olaplex's weakening sales and inventory oversupply were caused by two factors: (1) Olaplex's failure to anticipate the existence of competition for its products; and (2) Olaplex's failure to respond effectively to negative reports and social media about its products. CW-1 purportedly noted that now, "everyone" had a bond builder product like Olaplex, and so, the Company is losing market share.

228.   According to the Securities Class Action consolidated complaint, CW-2 was a marketing manager at Olaplex beginning in approximately April 2022 through the fall of 2022 and reported to Elisa Pospekhova, then Marketing Director for North America and APAC, who reported to Charlotte Watson, Chief Marketing Officer. CW-2 was responsible for managing Olaplex's marketing relationship with Sephora.

CW-2's account confirms that the Olaplex lilial issue led to the Company's slowing sales in 2022 after the issue was disclosed.

229.    According to the consolidated complaint, CW-2 purportedly said that CW-2 and colleagues in Marketing frequently worked with members of the Sales team and were frequently informed that the sales teams were not performing well and were struggling. CW-2 worked with Sammy Sawa, the current Director of Sales, who reported to Defendant Walden.

230.    CW-2 purportedly stated that, when CW-2 began working at Olaplex in April 2022, the Company was dealing with concerns reported in the media that an ingredient in its hair products, lilial, may be harmful and that the lilial concerns were causing problems with the Company's sales. CW-2 also stated that members of the sales team asked the marketing department to help them boost their performance.

231.    CW-2 recalled that the controversy over lilial began in late February or early March 2022, shortly before CW-2 started with Olaplex, and that CW-2 believed that the controversy was a large factor in the Company's struggling sales.

232.    CW-2 purportedly indicated that the sales team constantly complained to marketing that marketing's efforts were not generating enough sales. CW-2 purportedly believed that generating sales directly was the sales team's job, not marketing's, and that the sales reps misunderstood marketing's role. CW-2 allegedly explained that "takeaway" from those complaints was that the sales team was under great pressure to improve its numbers. CW-2 purportedly added that CW-2's view was reinforced by an email that had been shared by a colleague in sales, which had been sent by Defendant Walden to the sales team. CW-2 purportedly described Walden's language in the email as "very aggressive," possibly inappropriately so, and "shocking" as it pressured the sales team to bolster its numbers. CW-2 allegedly added that the email was sent sometime in the last two weeks of September 2022 and that

Walden needed sales figures to present at an upcoming meeting of the Board. CW-2 also reportedly characterized Defendant Walden's departure from Olaplex as sudden.

233. According to the Securities Class Action consolidated complaint, CW-2 had heard many comments from sales staff regarding a competitor called K18 that was threatening Olaplex's market share. CW-2 allegedly explained that K18 was a competitive threat because its product was very similar to Olaplex. CW-2 reportedly identified Living Proof as another significant competitor, again due to that company's having a similar product. Allegedly, CW-2 further noted that K18 began causing a significant loss of Olaplex's sales toward the beginning of 2022, while Living Proof was older.

234. The Securities Class Action consolidated complaint further states that CW-2 had been informed by friends, in October or November 2022, that Olaplex had a lot of products/inventory "stuck" with retailers, so much so that recent purchase orders had been cut. Allegedly, CW-2 had also heard from current employees that there may have been reductions in manufacturing as well due to the glut of products.

235. This glut of products due to waning consumer demand in the wake of the lilial issue was exacerbated by the Company's pre-IPO decision to hold significantly more months of inventory on hand than Olaplex had done in the past. Given the then-existing E.U. ban on lilial that affected Olaplex's best-selling No. 3 Hair Perfector product and the related significant likelihood of negative publicity and reputational damage, which would inevitably harm demand for the Company's products, this higher inventory position would compound the adverse impact of the lilial issue on the Company's business. The Offering Documents, however, failed to disclose this then-existing higher inventory position and the related significant risks it represented to the Company's business.

1

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**
**DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO OLAPLEX**

2

236.  As a result of the Individual Defendants' misconduct, Olaplex

3

disseminated improper public statements concerning Olaplex's operations, prospects,

4

and internal controls. This misconduct has devastated Olaplex's credibility.

5

237.  As a direct and proximate result of the Individual Defendants' actions,

6

Olaplex has expended, and will continue to expend, significant sums of money

7

defending and paying any settlement in the Securities Class Action.

8

238.  As a direct and proximate result of the Individual Defendants' actions as

9

alleged above, Olaplex's market capitalization has been substantially damaged, losing

10

millions of dollars in value because of the conduct described herein.

11

239.  Lastly, the actions of the Individual Defendants have irreparably

12

damaged Olaplex's corporate image and goodwill. For at least the foreseeable future,

13

Olaplex will suffer from what is known as the "liar's discount," a term applied to the

14

stocks of companies that have been implicated in illegal behavior and have misled the

15

investing public, such that Olaplex's ability to raise equity capital or debt on favorable

16

terms in the future is now impaired.

17

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

18

240.  In committing the wrongful acts alleged herein, the Individual

19

Defendants have pursued or joined in the pursuit of a common course of conduct and

20

have acted in concert with and conspired with one another in furtherance of their

21

wrongdoing. The Individual Defendants caused the Company to conceal the facts as

22

alleged herein. The Individual Defendants further aided and abetted and/or assisted

23

each other in breaching their respective duties.

24

241.  The purpose and effect of the conspiracy, common enterprise, and/or

25

common course of conduct were, among other things, to (i) facilitate and disguise the

26

Individual Defendants' violations of law, including breaches of fiduciary duty and

27

unjust enrichment; (ii) conceal adverse information concerning the Company's

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

242.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

243.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

244.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Olaplex and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

245.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

246.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

247.    Plaintiff is an owner of Olaplex common stock and has been an owner of Olaplex common stock since the wrongdoing alleged herein.

248.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY**

249.    At the time Plaintiff commenced this action, the Board consisted of eleven directors, including Director Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, E. White, M. White, and Zusi as well as relevant non-parties Baldwin and Bilbrey.

250.    The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

251.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Olaplex's business, operations, prospects, internal controls, and financial statements.

252.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective, and implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

253.   The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective, and implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith.

254.   If the Director Defendants were to bring a suit on behalf of Olaplex to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff's making a demand would be futile.

255.   Each of the Director Defendants reviewed and participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements in the Offering Documents alleged herein.

256.   Each of the Director Defendants reviewed, edited, approved, and disseminated to investors the Offering Documents.

257.   Each of the Director Defendants signed the Offering Documents, prepared and disseminated the Offering Documents, participated in the IPO, and solicited the purchase of Olaplex common stock in the IPO to serve their financial interests.

258.   Each of the Director Defendants signed the Company's Registration Statement filed with the SEC.

259.   The Director Defendants have a long-standing business and personal relationship. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

1

## THE AUDIT COMMITTEE DEFENDANTS FACE
## A GREATER LIKELIHOOD OF PERSONAL LIABILITY

2  260.   The Audit Committee Defendants (Gurwitch, Morfitt, and Zusi), as

3  members of the Audit Committee during the Relevant Period, participated in and

4  knowingly approved the filing of false financial statements. More specifically, as

5  members of the Audit Committee, the Audit Committee Defendants were obligated to

6  review the Company's business and financial risk management practices, the

7  Company's legal and regulatory compliance, and the integrity of the Company's

8  financial statements and internal controls. Instead, the Audit Committee Defendants,

9  as members of the Audit Committee, failed to ensure the integrity of the Company's

10 financial statements and financial reporting process and its systems of internal

11 accounting and financial controls and other financial information provided by the

12 Company, as required by the Audit Committee Charter. The Audit Committee

13 Defendants breached their fiduciary duties by allowing the Company to make the

14 improper statements discussed above. For this reason, the Audit Committee

15 Defendants cannot exercise disinterested business judgment in considering a demand.

16
17

## THE INSIDER TRADING DEFENDANTS ON THE BOARD
## FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY

18 261.   Because of their positions as officers and/or board members, each of the

19 Insider Trading Defendants (Glynn, Mussafer, and M. White) possessed material non-

20 public information as alleged herein.

21 262.   The Insider Trading Defendants unlawfully misused this information and

22 unjustly enriched themselves by selling their shares at artificially inflated prices. As a

23 result, the Insider Trading Defendants' conduct harmed Olaplex as the Insider Trading

24 Defendants unjustly enriched themselves at the Company's expense. Accordingly,

25 because this action asserts claims for unjust enrichment against the Insider Trading

26 Defendants and because the Insider Trading Defendants face a substantial likelihood

27 of liability for these claims as well as for their breaches of fiduciary duty to the

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company, the Insider Trading Defendants are incapable of considering a demand to commence and vigorously prosecute this action.

## THE SECURITIES CLASS ACTION DEFENDANTS ON THE BOARD FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY

263.   The Securities Class Action Defendants (Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Tiziani, Walden, E. White, M. White, Wong, and Zusi) are incapable of considering a demand to commence and vigorously prosecute this action because they each face an additional substantial likelihood of liability.

264.   The Securities Class Action Defendants are named defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and directors of Olaplex. Hence, the Securities Class Action Defendants are incapable of considering a demand to commence and vigorously prosecute this action because they each face an even greater likelihood of personal liability than the rest of the Defendants.

## DEFENDANTS DAGOUSSET, FINDLAY, GLYNN, GURWITCH, MORFITT, MUSSAFER, E. WHITE, M. WHITE, AND ZUSI LACK INDEPENDENCE

265.   Defendant Gurwitch has been a member of the Board of Managers of Penelope, the former general partner of Penelope Group Holdings, a former indirect parent of Olaplex, Inc. since May 2020. Defendant Gurwitch has worked with Advent since April 2020 as an advisor focusing on the beauty and wellness sector.

266.   Defendant Mussafer has been a member of the Board of Managers of Penelope since January 2020. Defendant Mussafer is Chairman and Managing Partner of Defendant Advent, which he joined in 1990.

267.   Defendant Glynn has been a member of the Board of Managers of Penelope since January 2020. Defendant Glynn has worked at Advent since 2016, where she currently serves as a managing partner. Defendant Advent is also affiliated with the Advent Funds. Defendant Glynn previously served as a managing director at Advent from 2016 to 2022.

268.   Defendant M. White has been a member of the Board of Managers of Penelope since January 2020. Defendant M. White is a principal at Advent and has focused on buyouts and growth equity investments in the retail, consumer, and leisure sector since joining Advent in 2019.

269.   Defendant Zusi has been a member of the Board of Managers of Penelope since July 2020. In 2015, Defendant Zusi founded Global Retail Advisors, LLC, which provides consulting on supply chain and operational capabilities to companies and investment firms, including Advent and some of its portfolio companies.

270.   Thus, Defendants Gurwitch, Mussafer, Glyn, M. White, and Zusi have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders.

271.   Additionally, Defendants Morfitt, Mussafer, and E. White have all served together on the board of Lululemon Athletica, Inc. since 2011, which was the product of another public offering by Defendant Advent. Thus, Defendants Morfitt, Mussafer, and E. White cannot exercise independent business judgment in considering a demand.

## FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duties

272.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

273.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Olaplex's business and affairs.

274.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

275.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Olaplex.

276.   In breach of their fiduciary duties owed to Olaplex, the Individual Defendants willfully or recklessly made, or caused, or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that (i) the Company's No. 3 Hair Perfector product had contained lilial; (ii) since at least May 2019, the Company was aware that the SCCS had determined that lilial posed a safety risk of reproductive toxicity to humans and was not considered safe; (iii) in August 2020, the E.U. banned the use of lilial in cosmetic products and that the ban was to become effective on March 1, 2022; (iv) as a result, the Company reformulated—behind closed doors—its No. 3 Hair Perfector product in June 2021 to remove lilial globally, just months before the IPO; (v) despite the E.U.'s ban on lilial and the Company's reformulation of its No. 3 Hair Perfector product, Olaplex continued to produce and/or sell its No. 3 Hair Perfector product at the time of, and months after the IPO; (vi) Olaplex was not selling "clean" products and continued to sell its No. 3 Hair Perfector product until at least January 2022; (vii) Olaplex opted to keep in inventory its No. 3 Hair Perfector product containing lilial which was likely to cause a surplus in inventory and place Olaplex and its distributors at a high risk position if the Company's sales slowed down; (viii) Olaplex was aware

of the detrimental effects the E.U.'s ban on lilial would have on Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position; (ix) because the Company was heavily dependent on social media channels to drive sales and marketing and build the overall brand reputation of the Company, Olaplex, could and in fact was, damaged by the negative publicity and reputational damage to the Olaplex brand; and (x) consequently, the Company lost sales, customers, market share to competitors, and revenue. As a result of the foregoing, the Company's public statements were materially false and misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

277.   The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, further rendering themselves personally liable to the Company for breaching their fiduciary duties.

278.   The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

279.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

280.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set

forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein and that internal controls were not adequately maintained or they acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

281.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

282.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Olaplex has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SECOND CAUSE OF ACTION
### Against the Securities Class Action Defendants for
### <u>Contribution under Sections 14(a) of the Exchange Act</u>

283.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

284.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

285.   The 2022 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Olaplex stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose that (i) the Company's No. 3 Hair Perfector product had contained lilial (ii) since at least May 2019, the Company was aware that the SCCS had determined that lilial posed a safety risk of reproductive toxicity to humans and was not considered safe; (iii) in August 2020, the E.U. banned the use of lilial in cosmetic products and that the ban was to become effective on March 1, 2022; (iv) as a result, the Company reformulated—behind closed doors—its No. 3 Hair Perfector product in June 2021 to remove lilial globally, just months before the IPO; (v) despite the E.U.'s ban on lilial and the Company's reformulation of its No. 3 Hair Perfector product, Olaplex continued to produce and/or sell its No. 3 Hair Perfector product at the time of, and months after the IPO; (vi) that Olaplex was not selling "clean" products and continued to sell its No. 3 Hair Perfector product until at least January of 2022; (vii) Olaplex opted to keep in inventory its No. 3 Hair Perfector product containing lilial which was likely to cause a surplus in inventory and place Olaplex and its distributors at a high risk position if the Company's sales would slow down; (viii) Olaplex was aware of the detrimental effects E.U.'s ban on lilial would have on Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position; (ix) because the Company was heavily dependent on social media channels to drive sales and marketing and build the overall brand reputation of the Company, Olaplex, could and in fact was, damaged by the negative publicity and reputational damage to the Olaplex brand; and (x) consequently, the Company lost sales, customers, market share to competitors, and revenue.

286.   The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

within the Company and roles in the process and in the preparation of the 2022 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2022 Proxy Statement.

287.   The omissions and false and misleading statements in the 2022 Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2022 Proxy Statement and in other information reasonably available to stockholders.

288.   As a direct and proximate result of the dissemination of the false and misleading 2022 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Olaplex suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Against the Securities Class Action Defendants for Contribution**
**Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

289.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

290.   As a named defendant in the Securities Class Action, Olaplex is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act on behalf of its stockholders. However, Section 11(f) of the Securities Act provides Olaplex with a cause of action against other alleged joint tortfeasors in the Securities Class Action.

291.   The Securities Class Action alleges that the Offering Documents contained untrue statements of material facts and omitted to state other facts necessary to make the statements made therein not misleading in accordance with the rules and regulations governing the proper preparation of a registration statement. Olaplex is

the registrant for the IPO, and the Individual Defendants were responsible for the contents and dissemination of the Registration Statement.

292.   The Securities Class Action also alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

293.   As the issuer of the shares, Olaplex is strictly liable to the plaintiffs in the Securities Class Action for the misstatements and omissions alleged in the Securities Class Action.

294.   Because of their positions of control and authority as officers and/or directors of Olaplex, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Olaplex, including the wrongful acts complained of herein in the Securities Class Action.

295.   Therefore, to the extent the Company is found liable for violations of Section 11 of the Securities Act, the Individual Defendants are liable to the Company pursuant to Section 11(f) for all appropriate contribution and/or indemnification.

**FOURTH CAUSE OF ACTION**
**<u>Against the Individual Defendants for Unjust Enrichment</u>**

296.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Olaplex.

298.   The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

statements, and received bonuses, stock options, or similar compensation from Olaplex that was tied to the performance or artificially inflated valuation of Olaplex, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

299.   Plaintiff, as a stockholder and representative of Olaplex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

300.   Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

301.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

302.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

303.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

304.   Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

### SIXTH CAUSE OF ACTION
### Against the Individual Defendants for Aiding and Abetting

305.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

306.   Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to the fact that the Individual Defendants are in breach of their fiduciary duties to Olaplex and have participated in a conspiracy in breach of fiduciary duties.

307.   In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

308.   The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

309.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

310.   Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

311.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to

substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**SEVENTH CAUSE OF ACTION**
**Against the Insider Trading Defendants for**
**Insider Selling and Misappropriation of Information**

312.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

313.   The Insider Trading Defendants (Advent, Glynn, Mussafer, and E. White) stood in a confidential relationship with Olaplex and owed Olaplex duties of loyalty, good faith, and care as officers, directors, and/or controlling stockholders.

314.   At the time of their stock sales set forth herein, the Insider Trading Defendants knew of the information described above and sold Olaplex common stock on the basis of such information.

315.   The information described above was proprietary, non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their benefit when they sold Olaplex common stock.

316.   The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

317.   Because the use of the Company's proprietary information for their gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

**EIGHTH CAUSE OF ACTION**
**Against the Insider Trading**
**Defendants for Indemnification**

318.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

319.   The misconduct by the Insider Trading Defendants (Advent, Glynn, Mussafer, and M. White) described above gives rise to the Company's alleged liability, and thereby, the Individual Defendants have directly and proximately caused substantial injury to Olaplex.

320.   Therefore, on behalf of the Company, Plaintiff seeks damages from the Individual Defendants for indemnification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Olaplex and that Plaintiff is a proper and adequate representative of the Company;

B.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.   Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of Olaplex stock while in possession of insider information as described herein;

D.   Awarding prejudgment interest to the Company;

E.   Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.   Granting such other and further relief as the Court deems just and proper.

99

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 22, 2024

Respectfully submitted,

s/ Melissa A. Fortunato

Melissa A. Fortunato (SBN 319767)
  fortunato@bespc.com
Marion C. Passmore (SBN 228474)
  passmore@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
445 S. Figueroa Street, Suite 3100
Los Angeles, CA  90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

100

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Gwyneth Hutchinson-Ramirez, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of Olaplex Holdings, Inc common stock at all relevant times.

Executed this __20__ day of __March__, 2024.

*Gwyneth Hutchinson*
_____
Gwyneth Hutchinson-Ramirez